## DALLAS OPERA HOUSE ASS'N v. DALLAS ENTERPRISES, Inc., et al.* (No. 7030.)

(Court of Civil Appeals of Texas. Austin. Nov. 17, 1926. Rehearing Denied Dec. 8, 1926.)

1. **Landlord and tenant** ⊙⟲231(6)—**Evidence held to show that February 1st was reasonable time for lessor to elect whether it would repair theater which burned December 27th.**

Evidence *held* to support finding that February 1st was reasonable time for lessor of theater to elect whether it would repair damage by fire which occurred on December 27th, where lease allowed election not to repair if it believed insurance insufficient, and contractors gave estimate of expense of repair January 24th.

2. **Landlord and tenant** ⊙⟲233(2)—**What constitutes reasonable time within which lessor should elect whether it would repair theater damaged by fire held jury question.**

Question of what is reasonable time in which lessor of theater should elect, under provision in lease, whether it would repair damage by fire, *held* for jury, where lease allowed

election not to repair if lessor believed insurance insufficient.

**3. Trial ⚍136(1)—What constitutes reasonable time for doing act held jury question.**

Ordinarily, question of what is reasonable time within which act should be done is for jury.

**4. Landlord and tenant ⚍152(5)—Lessor of theater which burned must elect whether it will repair, and notify lessee within reasonable time after ascertaining cost, under lease providing that it should "forthwith" repair damage from "proceeds" of insurance, or allow lessee to do so.**

Lessor of theater which burned *held* required to elect whether it would repair, and to notify lessee, within reasonable time after ascertaining whether proceeds of insurance would cover cost, under lease providing that it should "forthwith" repair from "proceeds" of insurance or notify lessee and allow it to repair, notwithstanding that policies allowed insurer to repair, since "forthwith" means immediately and "proceeds" of insurance does not mean actual money recovered.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Forthwith; Proceeds.]

**5. Contracts ⚍147(1)—Parties' object in entering ambiguous contract should be considered in construing it.**

In construing ambiguous contract, there should be proper regard for object which parties had in entering it, as well as language employed.

**6. Contracts ⚍147(2)—Words of contract will not be literally interpreted to defeat intention of parties.**

Words used in contract will not be given literal interpretation, where such construction would defeat intention of parties as evidenced by entire contract.

**7. Contracts ⚍154—Fair construction of ambiguous contract will be preferred to inequitable construction.**

When language of contract is doubtful and susceptible of two constructions, one of which makes it fair and customary, while the other makes it inequitable, former will be preferred.

**8. Landlord and tenant ⚍192(1)—Lessee must pay rent after destruction of leased building by fire, in absence of contrary provision in lease.**

Lessee must continue payment of rent after destruction of leased building by fire, unless there is contrary provision in lease, in view of its leasehold interest in land.

**9. Contracts ⚍176(1)—It is court's duty to construe contract.**

It is the duty of the court to construe a contract.

**10. Trial ⚍203(1)—Defendant has no right to have its theory of interpretation of contract, which court rejected, submitted to jury.**

Where court construed contract against defendant's contention, defendant had no right to have its theory of interpretation submitted to jury.

Error from District Court, Dallas County; Royall R. Watkins, Judge.

Action by the Dallas Enterprises, Inc., against the Dallas Opera House Association and another, in which the named defendant filed a cross-action. Judgment for plaintiff, and the defendant named brings error. Affirmed.

Locke & Locke, of Dallas, for plaintiff in error.

Phillips, Townsend & Phillips and Tom Scurry, all of Dallas, for defendants in error.

BLAIR, J. The parties will be designated appellant and appellee. Both parties to the suit are private corporations. The appeal involves a proper interpretation of particularly paragraph 8 of a lease contract between appellant and appellee, which reads:

"(8) Said lessee shall, in case of fire, give immediate notice to the lessor, who, out of the proceeds of the insurance provided or paid for as aforesaid by the lessee, shall cause the damage to be repaired forthwith, provided the lessor shall deem such proceeds sufficient for such repair. If the lessor shall deem such proceeds insufficient for such repair, the lessor shall notify the lessee in writing to that effect, and thereupon the lessee shall have the right within fifteen days from the receipt of such notice, but not thereafter, to deliver to the lessor a contract in writing whereby the lessee shall undertake to repair such damage properly, and to complete the same free from lien, liability, or expense of any kind to the lessor, and to indemnify the lessor against any lien, liability, or expense, for the proceeds of such insurance which shall be paid to lessee, provided, however, the lessee shall at the same time or within five days thereafter, and not afterwards, furnish to the lessor bond, or other security, satisfactory to the lessor, for the complete fulfillment of said contract; otherwise, this lease shall terminate. The rent shall not abate, in whole or in part, in case of fire, unless and until the lease is terminated as aforesaid."

The subject-matter of the suit is $20,000 of United States Liberty bonds and accrued interest thereon. The bonds were deposited, under a written escrow agreement executed simultaneously with the lease contract, with Dallas Trust & Savings Bank, depositary, to secure the performance of the lease agreement, and provided for the return of the bonds to appellee, in the event of a breach of the lease contract by appellant, and that, in the event of a breach of the contract by appellee, the bonds and interest were to become the property of appellant.

Appellee pleaded both the lease and the escrow contracts, and alleged the occurrence of a fire on December 27, 1921, completely destroying the building on the leased property; that appellee notified appellant of the fire on

the following day, but that appellant, in violation of its obligation under the lease contract and particularly paragraph 8 above quoted, failed and refused to repair the damage caused by the fire, and failed and refused to decide whether it deemed the insurance proceeds sufficient or insufficient for repairing the building, and refused to give appellee an opportunity to elect to repair the building, using the proceeds of the insurance for said purpose; and that, by reason of these facts, appellant breached the lease contract on February 1, 1922, thereby entitling appellee to the bonds and the interest coupons due thereon.

Appellant denied that it had violated the lease contract. It asserted, on the contrary, that appellee had breached the contract by failure to pay the rent due February 1, 1922, and by renouncing custody of the building and repudiating the lease, and by defacing the building and removing and appropriating numerous parts thereof after the fire, and by cross-action sought to recover the bonds and interest thereon because of such breach of the contract by appellee.

The Dallas Trust & Savings Bank, depositary of the bonds, answered as a party defendant that it held the bonds and coupons in its possession, and would abide the judgment of the court.

The trial court interpreted the lease contract, and especially the paragraph quoted to require of appellant that whenever it knew, or had sufficient information from which to know, either that the proceeds of insurance would be sufficient to repair, or to know that the proceeds of insurance would be insufficient to repair the damage by fire, it was obligated to elect within a reasonable time whether it should repair the building, or notify appellee that it deemed the proceeds insufficient and permit appellee to repair the building, using the proceeds of the insurance for such purpose. After having so interpreted the contract, the court concluded that the following was the only issue of fact to be submitted to the jury:

"Was February 1, 1922, a reasonable time for the Dallas Opera House Association to elect whether or not it would repair the damage to its building located on Main and St. Paul streets, said damage occurring by fire on December 27, 1921?"

The jury answered the issue, "Yes." Upon the jury's verdict judgment was rendered for appellee against appellant and the Dallas Trust & Savings Bank for title and possession of the bonds and accrued interest thereon, and against appellant on its cross-action.

We have reached the conclusion that the trial court correctly construed or interpreted the contract, and that the evidence supports the jury's finding of fact, and therefore affirm the judgment.

[1] The testimony on the material issue is undisputed. The lease contract covered what was once known as the Dallas Opera House, and more recently known as the Capitol Theatre. It began June, 1, 1921, and was for a term of five years, ending May 31, 1926, and provided for monthly rent of $2,250, or an aggregate rent during the five years of $135,000, besides taxes and premium on as much as $50,000 of fire insurance, which appellee was also to pay. The building was insured for $77,500 at the time of the fire. For the purposes of the lease it was completely destroyed by fire December 26-27, 1921. The day following the fire appellee notified appellant of it, and discussed with appellant's president the matter of rebuilding the house, and was informed that appellant's board of directors would meet about January 10, 1922, and that after said meeting it would definitely inform appellee as to "what they were going to do." On December 30, 1922, appellee wrote appellant a letter, setting out in substance the provisions of paragraph 8 of the contract above quoted, and, further, that:

"The Capitol Theatre was badly damaged by fire Monday night, December 26. You stated to the writer this morning substantially that, while you were inclined to think that the Dallas Opera House Association would elect to repair the damage, its decision in the matter would not be reached until about January 10th. Dallas Enterprises, Inc., is under a very heavy daily expense because of the fire and the interruption of its business in the Capitol Theatre, and must therefore insist upon its right under the lease contract to have the Dallas Opera House Association decide immediately and without any further delay whether it will proceed forthwith to repair the damage to the building.

"An immediate reply to this letter is requested and will be very much appreciated."

On December 31, 1921, appellant replied to this letter of appellee, and stated:

"Dallas Opera House Association has employed contractors to estimate and report immediately the amount necessary for the repair of the damages by fire occurring to the Dallas Opera House property on the early morning of December 27th, and it will speedily notify you if it deems the proceeds of the insurance insufficient for the repair of the damage."

The presidents of appellant and appellee corporations discussed the matter of repairing the building several times during the month of January, 1922. Appellee's officials always insisted and urged that a decision on the part of appellant as to whether it would repair or give appellee the right to repair was of great importance to it, informing appellant that appellee had employed a stock company for the year or season, and that its other expenses were very heavy, and therefore desired an early decision on the matter of rebuilding. The only meeting the directors had between the date of the fire and February 1st, the date appellee elected to declare the contract breached by appellant, was

about the 10th of January; and with reference to the action taken on the matter of repairing, the following, according to appellant's president, took place:

"I am sure that the directors had a meeting during the month of January, 1922. I couldn't tell exactly what date. I think they did about the 10th of January, just the usual annual meeting of the directors. * * * As for whether they decided if they could get enough to cover the repairs they would repair it, I will say they were very anxious to continue that lease. As for whether they made any decision, every one expressed themselves that they were very anxious for that lease to continue for the full length of time. They did express themselves as being in favor of repairing the building if the money was sufficient. No; they did not express themselves as to what to do if the money was insufficient."

On January 17, 1922, a stockholders' meeting was held and the only action taken with reference to repairing the building as shown by the minutes was as follows:

"By reason of the large loss and the matter of the collection of the insurance, until such time as it could be adjusted, it was not determined as to the feasibility of rebuilding for the present tenant, but the consensus of opinion was that, if sufficient of the insurance could be collected to rebuild for the present tenant, it would be advisable to do so.

"By reason of the great difficulty in the collection of the full amount of the insurance carried on the building, the president was authorized to employ legal counsel to effect same."

With reference to the promise of appellant, contained in its letter of December 31st to appellee, informing it that appellant had employed three contractors to estimate and "report immediately the amount necessary for the repair of the damage," appellant's president testified as follows:

"I got a final report from the appraisers about January 24th. * * * That made the total, according to that estimate, that it would take to replace the building $84,543.96. Yes; we had faith in the accuracy of that report. We believed that what these gentlemen said about what it would cost to repair the building was, at least, the best judgment we could get on that question, as to what it would cost to replace it exactly as it was before, to repair it in every detail just as it was before. We knew that our total insurance was $77,500.

"No; we did not, on January 24th, know what the proceeds were going to be. We did know they were not going to be over $77,500.

"We did not know it wouldn't be sufficient to put it back just like it was. No; we did not know exactly on January 24th if the proceeds of the insurance, $77,500, was not enough to put it back just like it was, because we hadn't had bids on it. We did have the estimate of three contracting firms here on what it would cost to reconstruct it. No; we did not, when we got that information that it would not be sufficient to put it back like it was, notify the lessee, the Dallas Enterprises."

"You asked me the following question: 'Did you, between January 24, 1922, after you got this paper, which has been marked defendant's Exhibit 23, did you between January 24, 1922, when you got this paper from your three contractors stating to you that it would cost $84,543.96 to repair the damage, to restore the building as it was, between that time when you got this report and when you knew that the utmost you could collect was $77,500, did you notify the lessee, the Dallas Enterprises, that the proceeds of the insurance were insufficient to repair, to restore the building as it was before?' In reply to that question, I will say that I did not notify them at all, because we didn't know what the proceeds were going to be. We did not give, up to that time, the lessee any notice that we deemed the proceeds insufficient for the repairs. No; I did not ask Mr. Hulsey to take over the policies and repair the building. I never offered to turn them over to him and let him take them."

With reference to the character and ability of the contractors so employed, appellant's president further testified:

"We did employ the best contractors that we knew anything about in Dallas to tell us how much it would cost to repair the building. We got the Watson Company and Fred A. Jones and Hughes-O'Rourke, the very best concerns of that sort here. We had faith in them, in their ability to make a correct estimate, and in their integrity."

After receiving this report, on January 24, 1922, the appellant made no effort to obtain a meeting of its directors or stockholders with reference to determining whether it deemed the insurance sufficient to repair the building, or whether it would repair the building for the appellee. Appellee paid the monthly rental of $2,250 due January 1, 1922; also taxes in the sum of $3,000 plus, aggregating a total payment of approximately $5,300, under the terms of the contract after the date of the fire. The proof is undisputed that every estimate received by appellant for cost of replacing or repairing the building exceeded the face value or maximum amount of insurance due under the policies, and appellant was definitely advised of that fact on January 24, 1922. It is admitted that appellant did all it could to collect the insurance by February 1, 1922, but that no final adjustment had been made at that time.

Appellant attacks this evidence as insufficient under the circumstances to support the jury's finding of fact, contending that the finding and the court's interpretation of the contract ultimately resulted in the proposition that appellant knew, or should have known, on or about January 24, 1922, that the proceeds of the insurance were insufficient to repair the damage; that appellant thereby became obligated to notify appellee at once that it deemed the insurance proceeds insufficient, and that its failure to do so constituted a breach of contract by appellant. Appellant insists that the proposition—

"obviously * * * involves the assumption, first, that the contractors' estimate was not

susceptible of any reduction whatever; second, that the plaintiff in error must accept such estimate as correct, without reinvestigation or rechecking; third, that the plaintiff in error must proceed immediately, without opportunity for the assembly of its directors or stockholders and consideration and discussion of the matter by them; and, fourth, that the plaintiff had no right to supplement the insurance proceeds by any amount whatever, in order to repair the damage."

The contention is without merit. Appellant selected its own experts to estimate the cost of repairing the building. It had every confidence in their ability and integrity to make a faithful, honest, and accurate report. It had seven days after their report was delivered to reinvestigate and recheck it for any mistake that may have been made. It had the same period of time within which to call a meeting of its directors or stockholders and obtain their view with reference to repairing the building. There were only a few of each, some five or six, and all of them resided in the city of Dallas. Appellant knew that time was of very material consequence to appellee. It knew that for more than a month appellee had been insisting upon an immediate notification as to whether appellant intended to repair the building. It was the consensus of opinion of both the directors and stockholders of appellant that the repairs should be made only in the event the insurance proceeds were sufficient to do so.

[2, 3] It is undisputed that at none of the meetings of the directors or stockholders was the question of supplementing the insurance proceeds discussed. The contract only obligated appellant to repair out of the insurance, if it deemed the insurance sufficient. The estimated cost of repairing, furnished by appellant's own contractors, was $84,543.96. The total insurance on the premises was only $77,500; and, although it may not be important here, appellant showed that it never thereafter received an estimate with reference to the cost of replacing the building but that exceeded the face value of the insurance policies. It may be true that in some instances the question of what is a reasonable time for the performance of an act becomes one of law and for the court to determine; but we are clear in the view that under the facts and circumstances just related in this case the question of what was reasonable time within which appellant was to determine whether it would repair the building was a question for the jury to pass upon. The rule is well settled that—

"Ordinarily, what is a reasonable time within which an act should be done, like negligence, is a question for the jury." Luhn v. Fordtran, 53 Tex. Civ. App. 148, 115 S. W. 667; Chandler v. Riley (Tex. Civ. App.) 210 S. W. 716; G., H. & S. A. Ry. Co. v. Cade, 100 Tex. 37, 94 S. W. 219; T. & P. Ry. Co. v. Jowers (Tex. Civ. App.) 110 S. W. 946.

[4] The remaining question relates to the correctness of the court's interpretation of the lease contract, and particularly paragraph 8 thereof. With respect to this question, appellant contends that it was not obligated to repair except "out of the proceeds of the insurance," and interprets that language as used in the contract to mean that it was not required to repair or to act in the matter until it had actually collected the insurance, and reduces its construction of the contract to the following concrete proposition:

"Especially must proceeds of the insurance signify money when it is considered that such proceeds were to be used in the repair of the fire damage. The damage was to be repaired out of the proceeds. How could policies of insurance, consisting of only a few sheets of paper, be used physically to repair the fire damage in a three-story brick theater building?"

In other words, appellant insists that the terms "proceeds," or "out of the proceeds of the insurance," or "such proceeds sufficient for such repairs," should be interpreted literally to mean money, and nothing else, and although lessor might repair out of other moneys, it was only required to repair "out of the proceeds of the insurance," which it could not do until the insurance was collected. Appellant's brief enters into an able and extensive discussion of what was meant by the term "proceeds," and cites many authorities defining the term generally, as well as construing it with reference to its use in particular contracts or written instruments. A careful examination of these authorities reveals the outstanding fact that all of them agree upon one proposition; namely, that the terms "proceeds," or "out of the proceeds," have many meanings and varied usages in contracts and written instruments, and that the use of such language in such contracts or written instruments is in many instances of doubtful meaning. That being true, contracts in which such language is used often become ambiguous and courts must look to other guides or rules to aid them in arriving at the proper meaning to be given such language, or, as said in 13 Corpus Juris, 520, 521:

"A word or expression in the contract may, standing alone, be capable of two meanings and yet the contract may be unambiguous. And, conversely, even an apparently unambiguous contract may be rendered ambiguous and open to construction if its words, taken literally, lead to absurdity or illegality when applied to the facts."

[5-7] Certainly the use of the language that the building should be repaired "forthwith" and "out of the proceeds of the insurance" as used in this contract, standing alone, is susceptible of two or more meanings and is also of doubtful meaning; and we are compelled to apply the following well-settled rules of interpretation of contracts in order

to arrive at the intention of the parties to this contract:

"The court should, as far as possible, place itself in the position of the parties when their minds met upon the terms of the agreement, and then from a consideration of the writing itself, its purpose, and the circumstances surrounding the transaction, endeavor to ascertain what they intended and what they agreed to do; i. e., upon what meaning of the terms used their minds actually met." 2 Elliott on Contracts, par. 1508.

"There should be a proper regard for the object which the parties had in entering into a contract, as well as the language employed in arriving at its proper construction. Inquiry may be made as to their situation at the time the contract was entered into and the purpose to be accomplished by its execution." 2 Elliott on Contracts, par. 1519. Dublin Electric & Gas Co. v. Thompson (Tex. Civ. App.) 166 S. W. 113.

"The words used (in the contract) will not be given a literal interpretation when to do so would defeat the intention of the parties, as evidenced by the entire contract. Even an apparently unambiguous contract may be rendered ambiguous and open to construction if the words lead to absurdity or illegality when applied to the facts. Moreover, when the language is doubtful so that it is susceptible of two constructions, one of which makes it fair and customary and such as prudent men would naturally execute, while the other makes it inequitable, unusual, and such as reasonable men would not be likely to enter into, the interpretation which makes it a natural and probable agreement will be preferred to that which makes it an unusual, unfair, or improbable contract." 2 Elliott on Contracts, par. 1510; Nichols v. Lorenz (Tex. Civ. App.) 237 S. W. 629; 13 Corpus Juris, 540.

[8] Appellant insists that the language "forthwith" and "out of the proceeds of insurance" should be interpreted, in the light of common knowledge that insurance is always difficult of collection and involves much loss of time in doing so, to mean that it should only be required to repair or elect to repair when it had actually collected the insurance. But does not that same fact and reasoning condemn the contract as absurd, when viewed from appellee's point of view. If it can be said that appellee knew as a matter of common knowledge that the collection of the insurance involved here would be difficult, and that it would require a long period of time to collect it, it would certainly be absurd to think that it would nevertheless contract to pay a monthly rental of $2,250 during that period of time. So we think that, since the building was to be repaired "forthwith" and "out of proceeds of insurance," it follows that the intention of the parties was that, if the proceeds of insurance were eventually used for the restoration of the building, it would come within the meaning of payment "out of the proceeds of insurance." Especially do we think this inter-

pretation of the language correct when viewed in the light of the rules of construction just quoted. Without doubt paragraph 8 was inserted in the contract for the benefit of appellee. Without such provision in the contract the law would require appellee to continue payment of rent because of its leasehold interest in the land. 16 R. C. L. 956; paragraph 465, Landlord and Tenant; Japhet v. Polemanakos (Tex. Civ. App.) 160 S. W. 416. The lease itself also requires appellee to continue the payment of rent in case of a fire, unless the contract was terminated as provided in paragraph 8. Appellant was therefore doubly protected in the event of a fire. With this in view, the parties then contracted that lessor should "forthwith" repair the building, in the event of a fire, which means immediately or directly. The eventual application of the insurance money for the repair of the building would therefore necessarily come within the meaning of the language "out of the proceeds of the insurance." The parties knew as a matter of common knowledge that the collection of insurance is difficult, involving a long period of time. The policies were all payable to appellant, and with the collection of which appellee had nothing to do. It was therefore subject to whatever contentions appellant might urge with reference to the final adjustment of the insurance whether those contentions were of material importance or not in so far as the matter of delay would be effected. As a matter of fact, the insurance in this case was not finally adjusted until September, 1922, some 10 months after the fire occurred. It is true that the policies provided that the insurance companies might repair, in the event they concluded the estimated cost of repairs furnished by the insured was considered excessive and in excess of the face value of the policies; but appellee was not shown to have had any knowledge of such provisions, and the extent of its contract with reference to insurance was merely to purchase insurance to the extent of $50,000 on the building; which it did. The fact that the insurance policies gave the insurance companies this privilege could not vary the terms of the lease contract, which provided that appellant should "forthwith" repair the building.

[9, 10] Appellant's other assignments relate to the refusal of the trial court to submit issues with reference to appellant's interpretation of the contract. These assignments are overruled, because it is the duty of the court to construe a contract, and, having construed it against appellant's contention, appellant had no right to have its theory of the interpretation of the contract submitted to the jury.

Other assignments relate to special requested charges submitted by appellant, which in effect were general charges, and amounted to

an instructed verdict, and were therefore properly overruled.

We find no error in the trial court's judgment, and therefore affirm it in all things.

Affirmed.