## DUBLIN ELECTRIC & GAS CO. v. THOMPSON. (No. 7914.)

(Court of Civil Appeals of Texas. Ft. Worth. April 11, 1914.)

1. WATERS AND WATER COURSES (§ 209*)—WATER COMPANIES—CONTRACTS—SUPPLYING WATER—SUFFICIENCY OF EVIDENCE.

In an action against the proprietor of a water plant, evidence *held* to show that when its agent told a consumer that he would be furnished water for all purposes, neither party contemplated the furnishing of water for fire protection, and hence it was not liable for its failure to furnish water for such purpose; it appearing that the city government had assumed the burden of fire protection.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 302; Dec. Dig. § 209.*]

2. WATERS AND WATER COURSES (§ 206*)—WATER COMPANIES — SUPPLY TO PRIVATE CONSUMERS.

An individual or company authorized to do so may so contract as to incur a liability for damages proximately resulting from a failure to furnish water sufficient to extinguish fires.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 301; Dec. Dig. § 206.*]

3. CONTRACTS (§ 143*)—CONSTRUCTION—MEANING OF LANGUAGE.

While as a general rule the terms of a contract are to be given their full effect and meaning, the intention of the parties governs, and their situation, the subject-matter, and other circumstances may be looked to in determining the meaning of terms, though not in themselves ambiguous, and a party will be bound by that meaning which he knew the other party supposed the words to bear.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 723, 743; Dec. Dig. § 143.*]

Appeal from District Court, Erath County; W. J. Oxford, Judge.

Action by J. N. Thompson against the Dublin Electric & Gas Company. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

E. E. Solomon, of Dublin, and Templeton, Beall & Williams, of Dallas, for appellant. Hickman & Bateman, of Dublin, for appellee.

CONNER, C. J. Appellee instituted this suit against the appellant to recover the sum of $4,028, the alleged value of a house and its contents claimed to have been destroyed by fire on the 12th day of July, 1911. It was alleged in the plaintiff's petition that he was a resident of the town of Dublin and that the defendant was operating a water plant in said town; and, in substance, that the defendant through its manager and agent M. S. Karmany had for a valuable consideration, as stated in the petition, contracted "to furnish appellee all the water he wanted for all purposes at all times;" that upon the date stated his house caught fire which was discovered by the plaintiff in its incipiency; and that he attached a hose to a hydrant in the yard with which he could and would have extinguished the fire had there been water, but that there was none in the pipes, by reason of which he was unable to extinguish the fire and his house and contents were totally destroyed, to his damage in the amount claimed. The defendant answered by a general denial and by special answers setting up, first, that the water service contemplated in the contract was for domestic purposes and to be in quantity suitable for such purposes only; that the defendant company was not authorized to enter into a contract for fire protection, nor was it engaged in the business of furnishing water therefor to private patrons; that the agent through whom the plaintiff alleged the contract had been made was but a local agent and wholly unauthorized to make any such contract as alleged. There were also several other special pleas not necessary to notice. The trial before a jury resulted in a verdict and judgment for the plaintiff J. N. Thompson in the sum of $2,250, and this appeal has been prosecuted.

[1] Upon the conclusion of the testimony, the defendant requested a peremptory instruction in its favor, and the vital question in this case arises under the assignment to the action of the court in refusing this instruction. There is little or no dispute in the testimony. Substantially it is as follows: It was shown that the town of Dublin in which plaintiff's premises were located contains about 2,500 people with a city government; that the appellant company had about 355 customers on its system for the distribution of water, which was furnished through service pipes from one-half to three-fourths inches in size; that the company had a contract with the city for fire hydrants; but

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

that the city had nothing to do with the service pipes. The plaintiff Thompson testified upon the point in question as follows: "I had been on the flat rate all the time until some time after Karmany took charge of the plant. Don't know how long I ran without the meter after he took charge, but a good while. By the 'flat rate' I mean I just paid $1 a month. I had hydrants on my premises. These hydrants were connected with the water mains. I put the meter on something like a year before the house burned, which was the 12th day of July, 1911. I talked with Mr. Karmany before he put the meter on. He sent a man up there to put the meter on. Before Karmany put the meter on, I had a talk with him in which conversation he said he was going to put meters on everybody. He told me that, and I told him I objected to him putting a meter on me. I said: 'I don't mind paying you for all the water I use, but don't want to pay you for measuring it to me.' What I meant by not wanting to pay him for measuring it to me was that I did not want to pay him 25 cents a month for the meter. Karmany told me that he would charge me 25 cents a month for the meter and I objected. I told him I was willing to pay him for all the water I used, but didn't think it was right for me to pay him 25 cents a month extra to furnish something to measure water to me, that I thought the company ought to furnish that, and he said he was going to put them on everybody. He said he would put the meter on and charge me 25 cents a month for the meter and 50 cents a thousand gallons for the water. Later on I told him I objected to paying him for the meter rent, and he said I would have to do it or he would cut the water off, and stated to me it was best for me to have the meter on there, and that then I could use all the water here for any purpose that I wanted to use it for; and he said: 'Don't you be uneasy about that, we will have all the water there you want to use for any purpose all the time. You can run it on the ground if you want to.' I went on and paid for the meter, paying him 25 cents a month for it, with the expectation of getting all the water I wanted to use, and that is why I did it. I think it was about 12 months after I had that talk until the fire occurred, as well as I remember."

On cross-examination plaintiff further said: "I had ordinary hydrants at my place. My hydrant was about six feet from my front door, not in front, but kinder to one side. All the hydrants were there when I went there. I had been using them to get water. I had used the water for sprinkling purposes. I had a garden hose. I had a hydrant close to the kitchen door, on the other side. The other hydrant was at the lot. I had no hydrants at all in the house except a regular bathroom hydrant in the bathroom. I went to the back hydrant, beside the kitchen door. That was a hydrant I used for general ordinary purposes about the kitchen. I didn't use it for irrigation. I ran to the hydrant and put my hose on it. I had a 50-foot hose. I wanted to get on the building and put the fire out. I had a bucket there, but couldn't get any water. I turned the hydrant first, and thought the water would come on. I first went to the hydrant and turned it on. There was no water, and I screwed the hose on so if the water came on we could put the water on the fire and put it out. * * * I don't remember what all Karmany said and what he didn't say. He sent a man up there to put in the meter. I think it was the day or the next day that I had the conversation with Karmany. It was a week or two after I talked to him that he put the meter in himself. I was at the house at the time the meter was put in. I went to tell Karmany about the meter and object to having the meter in there, and told him I wouldn't pay the rent on it, and he said, 'You will or I will cut you off from water,' and said 'It is better for you to have the meter in there, and you can use it for every purpose you want it for,' and I said, 'I want you to understand that I want the water there at all times when I want it for every purpose I want to use it for,' and he said, 'There will be plenty of water for any purpose you want to use it for. You can turn it out on the ground if you want to.' I didn't say sprinkling or stock water. I didn't have my mind on fire. I didn't know but what it was for fire. I didn't sign any written contract for a meter. I told Karmany I wouldn't pay the rent on the meter. When I had the last conversation he already had the meter in. He said he would cut me off if I didn't pay the rent. I suppose he meant to take the meter out. My mind wasn't resting on anything at all. Karmany said he would have water there for all purposes I wanted to use it for, and will state further he didn't have it there for all purposes. I said nothing about wanting the water for 24 hours, night and day. He said, 'It is better for you to have the meter, then you will have water for any purpose you want to use it for.' He said, 'At any time you want it.' * * * It was some time after the house burned that it occurred to me that I had a contract with these people for fire protection."

M. S. Karmany, the local manager of the appellant company, testified that: "I told him (Thompson) we were having considerable amount of trouble in furnishing water, and my attention had been called to the fact that he was abusing the flat rate, and that it would be necessary for the company to put on the meter to protect them, and I explained the rate, that the rate would be 50 cents a thousand gallons and 25 cents on the meter, which made his meter rate $1.25. If he used any amount over 2,000 gallons he would pay us at the rate of 50 cents a thousand on the

excess. That is the conference between myself and Mr. Thompson. I also stated that he could use his water for the purpose of sprinkling his lawns and garden or for whatever purpose he wanted to use it in the sprinkling of lawns or gardens or for domestic service and we wouldn't object to his using it on his garden or lawn or for domestic purposes. I don't recall his reply to that. I have no authority whatever to make contracts for fire protection on our service pipes. It was not in my mind at the time to do it. Whatever authority I did have I got from Mr. Stichter, the general manager. * * * Beginning on the 1st of June, 1910, and for three months on, we were short on water. At nights we had to cut the valves in the mains to protect ourselves. The plaintiff never did tell me anything at any time in respect to fire protection. The first I ever heard of his making that claim was when 1 was advised by letter from Mr. Solomon, the 15th of this month."

We should also state that there was evidence tending to show that, on the night before the fire in question, appellee had been watering his yard, and for that purpose had attached the ordinary yard hose to the ordinary yard hydrant and left the hose attached to the hydrant during the night; that early the next morning he discovered the fire which destroyed his house soon after it began and immediately ran to the hose and attempted to turn the water on, but found none, and that had there been any water in the pipes, as was usual, he could and would have put out the fire in time to have saved his property. Regardless of the issue of whether appellant's general manager, Karmany, was authorized to make any such contract, as alleged by the plaintiff, we are of the opinion that the evidence quoted, which is substantially all there is relevant to the question, is wholly insufficient to sustain the verdict and judgment.

[2] It cannot be denied that an individual or company authorized to so do may contract so as to incur a liability for damages proximately resulting from a failure to furnish water sufficient to extinguish fires. Lottman Bros. Mfg. Co. v. Houston Waterworks Co. (Civ. App.) 38 S. W. 357; Harris & Cole Bros. v. Columbia Water & Light Co., 114 Tenn. 328, 85 S. W. 897. In the cases cited the contract to so furnish water was express, but in the case before us it is not so. It cannot be said that the appellant company expressly contracted to furnish water at times and in sufficient quantities to extinguish fires. The plaintiff himself testified that, at the time of the conversation and agreement upon which he relies as establishing the contract alleged, the word "fire" was not used, nor did he have his mind on that subject. To the same effect was the testimony of Karmany, the local manager. So that the contract, as plaintiff alleges it,

is one of inference only from the use of the very general terms that plaintiff was to have water "for all purposes."

[3] While as a general rule the terms of a contract are to be given their full effect and meaning, yet the ruling object is to ascertain the intention of the parties, and hence their situation, the subject-matter, and other circumstances, may be looked to in determining the meaning of the terms used, although the terms are not in themselves ambiguous, and a party will be bound by that meaning which he knew the other party to the contract supposed the words to bear. San Jacinto Oil Co. v. Ft. Worth Light & Power Co., 41 Tex. Civ. App. 293, 93 S. W. 173. It seems evident to us that the purposes of the parties in mind at the time was that water was to be furnished for all ordinary domestic purposes, and that it was not intended as an agreement that water should be furnished for extraordinary purposes. Neither the service pipes, hydrants, hose, or other circumstance, tends to show that it was ever the purpose of the company, or the expectation of the plaintiff, that the water to be furnished to him should be at times and in quantities sufficient to prevent the destruction of his premises by fire. It seems that the city government had taken upon itself the burden of protecting its citizens, and that it was presumably at least supplied with appropriate hydrants, hose, and other apparatus for that purpose. The fact that the company had contracted with the city for the purpose of furnishing water for fire purposes, and that the residences were provided with no facilities for that purpose, nor charged a rate commensurate with the risk thereby necessarily incurred, seems conclusive, in the absence of express words to the contrary, against the plaintiff's contention in this case. See Niehaus Bros. Co. v. Water Co., by the Supreme Court of California, 159 Cal. 305, 113 Pac. 375, 36 L. R. A. (N. S.) 1045, and cases therein cited.

In view of what has been said, other questions need not be determined. We conclude that the court should have given the peremptory instruction and that the judgment below should be reversed and here rendered for the appellant.