## Rodgers v. Rodgers, et al.

(Decided January 9, 1925.)

### Appeal from Christian Circuit Court.

1. Reformation of Instruments—Proof Must be Clear and Convincing under All Facts and Circumstances.—To warrant reformation of an instrument, the proof of mutual mistake or fraud must be clear and convincing, and such proof is not measured alone by express statement of witnesses, but may be tested by character of testimony, coherency of entire case, documents, circumstances, and facts.

2. Reformation of Instruments—Breach of Contemporaneous Parol Promise Not Ground for Reformation.—Reformation cannot be decreed on the faith of a contemporaneous oral promise not kept in absence of fraud or mistake in preparation of an instrument which appears to have been understood by parties signing.

3. Reformation of Instruments—Evidence of Oral Contemporaneous Promise Held Not to Warrant Reformation of Bill of Sale.— Where on signing of bill of sale person furnishing purchaser money objected that accounts receivable passing under instrument might not be collectible, and seller orally promised to guarantee them in full, whereupon bill of sale was signed, evidence held not to warrant reformation tor mutual mistake in omitting guaranty from writing.

IRA D. SMITH, W. H. SOUTHALL, Jr., and McKENZIE & SMITH for appellant.

SELDEN Y. TRIMBLE, TRIMBLE & BELL and MILLER & ROWE for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming on the original and reversing on the cross appeal.

Under a contract with the Lee Tire and Rubber Company of Pennsylvania giving him the exclusive sales agency for its tires in certain counties of Western Kentucky, among which were McCracken and Christian, the appellee, R. A. Rodgers, had prior to April 15, 1921, been conducting an automobile tire business in Paducah with a branch at Hopkinsville. At this time the affairs of this Hopkinsville branch, which had been under the management of H. C. Moore, had become much involved, and it is not quite clear from the proof that R. A. Rodgers was then himself absolutely solvent. On the date mentioned, in company with James Wilton, an auditor, Rodgers went to Hopkinsville and there got in touch with

his son, A. H. Rodgers, the appellant, and hereinafter called Herbert, for the purpose of selling to him the Hopkinsville branch. Herbert, however, had no funds wherewith to make the purchase but he thought that he could get his wife and father-in-law, Mr. J. N. Boston, to assist him in financing the deal. So a statement of assets and liabilities was taken off the books of the Hopkinsville branch that night by Wilton and with this statement before them, he drew up a bill of sale dated April 15, 1921. This bill of sale first set out the balance sheet made by Wilton and then recited that "for the sum of $3,548.12 and other considerations" R. A. Rodgers sold the business, name and good will of this Hopkinsville branch to his son, Herbert. It also provided for the future purchases by Herbert of automobile tires through the Paduach office and for the terms and time of payment for such purchases, but as these provisions are not material to this suit we will not notice them further. The balance sheet above mentioned disclosed that the tangible assets about balanced in value the outstanding liabilities of the company. The remaining assets consisted of accounts and notes amounting to $7,488.77, from which were deducted accounts marked "doubt" of $205.00, leaving net $7,283.77. The net worth of the company as shown by this balance sheet was $7,096.25, and the cash consideration set out in the bill of sale was just one-half of this amount. After the bill of sale, which is full and complete on its face, had been drawn up by Wilton, it was signed by Herbert and then taken by R. A. Rodgers and Wilton back to Paducah, where it was shown by them to Boston, appellant's father-in-law, who was then ill in a hospital there. After Boston had looked over the financial statement of the Hopkinsville branch and had explained to him the entire contract as embodied in the bill of sale, he raised a question about the value of the accounts mentioned therein, whereupon, as is testified to by him, R. A. Rodgers and Wilton, R. A. Rodgers agreed that he would guarantee the accounts to pay out one hundred cents on the dollar. Satisfied with this promise, Boston surrendered to R. A. Rodgers the latter's note for $3,000.00 which he held, and his daughter, the wife of Herbert, also surrendered to R. A. Rodgers his note for $1,000.00 which she held. To balance the difference between the cash consideration of $3,548.12 mentioned in the bill of sale and the sum of these two notes, R. A.

Rodgers sent, as he says, his check to Herbert at Hopkinsville for $451.88, and at the same time a copy of the bill of sale as theretofore written and now signed by him. Thereupon Herbert took charge of the Hopkinsville branch and conducted it up until November following when this suit was brought.

During the interim Herbert had bought from his father at Paducah automobile tires and merchandise to the extent of $3,094.12, as he admits in his proof, although his answer admits only $3,033.28, for which he was indebted to his father at the close of this period. He had by November also collected in a large part of the outstanding accounts referred to in the bill of sale, the uncollected portion amounting to $3,719.42, and he then had on hand very little merchandise or fixtures. It is true that he had paid off so far as this record shows the liabilities set out in the bill of sale and had drawn some $1,600.00, as he says, for living expenses, but at that, there was a large sum of money which he had realized out of the business but where it has gone he does not say.

Between the date of the bill of sale in April and the bringing of this suit in November following, the appellee, R. A. Rodgers, had become more and more involved in the conduct of his business at Paducah. In September, he was compelled to call upon his son, the appellee, R. E. Rodgers, who was conducting a like business at Owensboro, for help. This son will hereinafter be called Emmett. Emmett was a good business man and was prosperous. In response to his father's call, he went to Paducah and straightened out his father's affairs. In so doing, he became guarantor of his father's account with the Lee Tire and Rubber Company in Pennsylvania, subject to certain conditions of control of his father's business by him. He then returned to Owensboro, but he had scarcely reached home when his father utterly ignored all of the conditions that Emmett had prescribed for the conduct of the business at Paducah. Becoming alarmed at the way things were going at Paducah and fearful of his guarantee, Emmett in the latter part of October went back to Paducah, examined his father's books, found him insolvent, and then in order to save him the humiliation of a public failure took over the business and its assets and assumed all its outstanding liabilities. Although R. A. Rodgers consented, of course, to this transfer, he became angry at his son for "forcing him out of

business," as he called it. At the time Emmett took over
the Paducah business, he found on its books the outstand-
ing account against his brother, Herbert, at Hopkinsville
above mentioned.  At this time it was also evident that
the condition of the Hopkinsville branch was about as
bad as that of the Paducah, and so Emmett went to Hop-
kinsville to straighten out that situation and to collect
what was due the Paducah branch.  Just prior to Em-
mett's arrival at Hopkinsville, Herbert took his loose
leaf ledger from the store and had it recopied.  He now
claims that the copy is identical with the original ledger
sheets, and that the reason he had them copied was that
he wanted the books to look nice.  However, he did not
introduce the copyist to verify this statement.  Emmett,
on arriving at Hopkinsville, went over the situation with
his brother, Herbert, and then proposed to buy him out.
Some high words coming up between them the conference
was adjourned to a day in the following week.  During the
adjournment, Herbert took out of the ledger book the
ledger sheet showing his personal account and has kept
it hidden during this litigation.  He also took other prop-
erty from the store to his apartments and began negotia-
tions with outsiders for the sale of a large part of the
property remaining in the store. When the parties met
again, Herbert was accompanied by his attorney and his
father-in-law.  He declined the proposition submitted to
him by his brother, Emmett, and demanded as the sale
price of a practically insolvent business, if the account
due the Paducah branch be taken into consideration, some
$3,000.00 on the claim that at the time of the sale of the
business to him in April his father had guaranteed the
outstanding accounts to be worth one hundred cents on
the dollar, but that these accounts had not paid out one
hundred cents on the dollar though he had made diligent
efforts to make them do so, and there were still uncol-
lected worthless accounts amounting to $3,719.42.  The
bill of sale being silent as to such guarantee, Herbert and
his father-in-law claimed that the guarantee had been
left out through an oversight.  This was the first that
Emmett had ever heard of such guarantee.  Declining to
pay the sum demanded or credit the account by this al-
leged counterclaim, he brought suit on the account due
the Paducah branch, making his father, his assignor, a
nominal plaintiff, and in the suit asked for and obtained
an attachment and receiver.  Immediately after the suit
was filed he served a notice and a subpoena on Herbert

for the purpose of taking his deposition as if under cross-examination. On the day set in the notice and subpoena for the taking of the deposition, however, Herbert left town and remained away all day. Although he claims that the reason for thus absenting himself was because his counsel, due to an engagement made prior to the serving of the subpoena, could not be present at the time set and was unable to arrange with Emmett's counsel for a postponement, and he was not willing to submit to examination without the presence of his counsel, yet it appears that although Emmett's counsel thereafter made strenuous efforts through warrants and alias warrants of arrest directed to the sheriffs of Christian county and of a number of surrounding counties to obtain the presence of Herbert for the purpose of taking his deposition, he successfully evaded such processes for almost six months and did not give the deposition demanded until after the issues had been made up in this case.

By his answer and counterclaim, Herbert admitted the account sued on in this action to the extent of $3,033.28, but pleaded by way of counterclaim that through mutual oversight there had been omitted from the bill of sale a clause or provision whereby his father guaranteed the outstanding accounts to be worth one hundred cents on the dollar; that this guarantee was a part of the transaction of sale and a part of the consideration of his purchase of the Hopkinsville business, and that the outstanding accounts had failed to realize one hundred cents on the dollar by the amount of $3,719.42, for which he asked credit on the account sued on and a judgment for the difference between them. A reply in the nature of a traverse completed the issues.

The proof of the appellant was directed, in the main, to show the omission by mutual mistake or oversight of the alleged provision concerning the guaranteeing of the accounts. On the theory that appellant had not shown himself entitled to a reformation of the bill of sale, and that as the bill of sale was full and complete on its face, it could not be varied by parole evidence in absence of a right of reformation, the lower court excluded all the testimony concerning the alleged guarantee and gave Emmett a judgment for $3,033.28, admitted to be due him by Herbert's answer. Appellant's appeal presents squarely the proposition whether or not by his proof he

showed himself entitled to a reformation of the bill of sale.

It has been written by this court times without number that to obtain the reformation of an instrument, the proof of mutual mistake or fraud must be clear and convincing and such proof is not confined alone to the express statements of witnesses, but may also be tested by the character of the testimony, the coherency of the entire case, and the documents, circumstances and facts which are proved. Irwin v. Westwood Real Estate and Development Co., 200 Ky. 760, 255 S. W. 546. The appellant, to substantiate his claim, introduced himself, Wilton, who drew the bill of sale, Boston, his father-in-law, and his father, a nominal plaintiff and appellee herein. Appellant and his father testified that the guarantee of one hundred cents on the dollar was a part of the contract of sale, and that it was omitted from the written bill of sale through a mutual oversight. As heretofore pointed out, Boston, R. A. Rodgers, and Wilton all three testified that after the bill of sale in its entirety had been explained to Boston by Wilton and Rodgers in the hospital at Paducah, Boston raised the question about the value of the accounts covered by it. It is obvious from this that Boston was then quite aware that there was nothing said in the bill of sale about a guarantee or he would not have raised the question he did, and it is equally as obvious that R. A. Rodgers and Wilton both knew the guarantee was not in the bill of sale, because instead of referring Boston to the bill of sale on the question he raised, R. A. Rodgers said that he would guarantee the accounts at one hundred cents on the dollar. Herbert was not present at this conversation, being in Hopkinsville, and only he and his father were parties to this bill of sale. Up to this time, R. A. Rodgers had not signed the bill of sale and if it had been the desire of the parties to incorporate this guarantee, which it is claimed was a part of the contract of sale, in the bill of sale it could then easily have been done, especially since its absence was thus called to the attention of at least one of the parties and of the draftsman. However, we believe that the parties at that time had exactly the same idea of the situation as is disclosed by the testimony in this case of the auditor, Wilton. On direct examination this witness said: Q. "Mr. Wilton, why was it that that (the guarantee) was not incorporated in the bill of sale

that you drew?" A. "It was the topic—well, it was not included in the bill of sale through an oversight. The amount was indeterminable or indefinite and neither party could agree as to the actual value of the accounts; the time was limited so it was left to a future date to find out what they would amount to, and the settlement was made on that basis." On cross-examination this same witness said: "The main reason for the agreement or bill of sale being drawn up to the best of my belief was for the purpose of transferring the assets and liabilities of the business to Mr. A. H. Rogers, also showing him or giving him a statement that he would have the sales right on the Lee Tire products for the counties named in the agreement." Q. "And your understanding is that that is all they wanted the writing to show?" A. "My instructions were to write this agreement up as it is." Q. "And your understanding was that that is all they wanted the writing to show?" A. "My understanding was that this agreement was satisfactory to both parties." Q. "And your understanding was that this was just what they wanted written, was it not?" A. "This is what they wanted written, this agreement was." Q. "You wrote it just like they wanted it?" A. "Exactly." It is plain from the reading of this witness' testimony and from the other facts and circumstances shown by the evidence in the case that the bill of sale as drawn was drafted exactly as the parties wished it drafted and that if there ever was any such guarantee as here claimed, it was not put into the written contract, nor was it ever intended to be put into the written contract, but, on the contrary, the parties intended to and did rely so far as the guarantee is concerned upon a contemporaneous oral agreement. This being true, the case comes squarely within the rule laid down in the case of Pickrell & Craig Co. v. Castleman-Blakemore, 174 Ky. 1, 191 S. W. 680, wherein it is succinctly stated: "When there is no fraud or mistake in the preparation of an instrument, and it appears that the party signing understood its language and purport, it cannot be reformed on the faith of a contemporaneous oral promise which was not kept." Therefore the lower court correctly held that the appellant had not shown himself entitled to a reformation of his bill of sale, and that not being so entitled, he was not privileged to vary its written terms by proof of the oral agree-

ment about the guarantee. His judgment dismissing appellant's counterclaim is therefore affirmed.

Appellee, R. E. Rodgers, has filed a cross-appeal claiming that he proved the account sued on to be $3,270.55, but was given judgment only in the amount admitted by appellant's answer, that is $3,033.28. Appellee's proof as to the exact amount of his claim is very unsatisfactory, and we therefore are obliged to abide by the admissions made by appellant as to what is due appellee. Although appellant's answer admits only $3,033.28 due, his proof shows the amount to be $3,094.12, and therefore to the extent of the difference between these two figures, the case is reversed on appellee's cross-appeal, with instructions to the lower court to enter judgment in favor of appellee, R. E. Rodgers, against the appellant, A. H. Rodgers, for $3,094.12 instead of $3,033.28. In all other respects the judgment is affirmed.

Affirmed on the original and reversed on the cross appeal.