## HOFFER OIL CORPORATION v. HUGHES.
### (No. 12087.)

Court of Civil Appeals of Texas. Fort Worth. Feb. 16, 1929.

Rehearing Denied March 16, 1929.

H. A. Turner, of Fort Worth, for appellant.
B. W. Tipton, of Electra, and D. J. Brookreson, of Benjamin, for appellee.

BUCK, J. This suit was filed by Hal Hughes, of Electra, Wichita county, against the Hoffer Oil Corporation, of which T. B. Hoffer is president and resides at Fort Worth. On June 12, 1925, T. B. Hoffer wrote Hal Hughes the following letter:

"Referring to your discussion this morning concerning the drilling of a well for this company on what is known as the Patton lands in King County, Texas, I hereby wish to confirm the understanding we had this morning:

"You agree to take care of this work, furnish all of the labor necessary for the completion of this well to the depth that we wish to go, which will not exceed 3,500 feet, and the possible depth as discussed with you this morning.

"We understand that you have a complete line of rotary equipment and will be able to furnish small parts of such material as might be needed in addition to that now on the ground. (You agree to take care of this work and carry the same to completion, you to receive the sum of $5,000 for your services in connection with the well.) You are to be in sole charge of the work and are to look after the handling of the entire proposition for this company, which will include the moving of the rig and all material from its present location to the new location. We are to pay all bills in connection with labor, and repairs to equipment that will be needed in the drilling of this well, you agreeing to furnish free such other necessary equipment with the exception of boilers. The drilling of the well is to be handled under our direction, and formations are to be cored and a small hole drilled ahead if we desire.

"You agree to immediately take over the work and get the same started to comply with our contract.

"You are to furnish a man to look after odd jobs on the well, who will forward drilling reports and information to this office every day, provided that he reaches Benjamin or can get same into the mail.

"In the event of formation looking favorable you will take up with Mr. Moss or myself by telephone and get our ideas with ref-

erence to same as to whether or not we want further tests made.

"In case of oil showings or anything favorable, the well should be shut down immediately and this office notified by wire or telephone.

"Yours very truly,
"Hoffer Oil Corporation,
"T. B. Hoffer, President."

After receiving this letter, Hughes went to King county, where the well was to be drilled, and moved the rig from the place where it was then located to the place where the well was to be drilled. This took until the early part of July, 1925. On March 24, 1926, the Hoffer Oil Corporation wrote Hughes the following letter:

"With reference to the King County well, wish to advise that we have assigned our interest in the acreage and well to other parties here, and they in turn have a new contract with the landowners for the drilling of the well. I believe it is their intention to skid the rig and drill a cable tool test, using an oil engine for this purpose. I understand from Mr. Capers that you may possibly have a few small tools left at the location, and if you will be good enough to let either he or this office know when you can make a trip to the well he will go out at the same time and check up your material with you. What necessary adjustments, if any, with you can be made after that time.

"Yours very truly,
"Hoffer Oil Corporation,
"F. M. Moss, Vice President."

The drillers had had considerable trouble in having to use alkali water. Hughes wrote Mr. Moss, vice president of the Hoffer Oil Corporation, a letter on August 31, 1925, in which he said:

"This water boils away from the sides of the boiler where the fire hits it and it burns just the same as if there was no water in the boiler. I really think that.we will have to lay this line. We only can run a little bit and then we have to stop and it takes us two or three days to get started again.

"Just to be fair with you, our hands are tied. I hope I am wrong, but I don't believe there is any chemical that will work. I will let you know just as soon as we get started up how it is working."

On receipt of the letter on March 24, 1926, hereinabove set out, the drilling stopped, though they had not been actively drilling for some weeks.

Thereafter, on to wit October 4, 1927, suit was filed in the district court of King county, and then transferred by agreement to the district court of Knox county, and subsequently transferred by agreement to the district court of Wichita county. After the evidence had been introduced, the court gave a peremptory instruction for plaintiff, and defendant has appealed.

## Opinion.

The question for us to decide is whether the letter of June 12, 1925, contained an unqualified promise to pay to Hal Hughes the sum of $5,000 if he should superintend the drilling of the well in question until he was stopped under orders of the Hoffer Oil Corporation; or was he to be paid said amount only when he had secured a paying sand, or had reached 3,500 feet in depth. The appellee asserts that the first construction is the only one permissible, and appellant that the second construction is proper.

The testimony shows that the well was drilled to a depth of 1,590 feet. Appellee testified as follows:

"I will state that I did enter into an agreement, drilling agreement, to drill a well for the Hoffer Oil Company, or Hoffer Oil Corporation, it is. This letter of June 12, 1925, is the agreement that I had with the head of the Hoffer Oil Corporation relative to the drilling of that well. We drilled the well 1,590 feet, I think. I called at Mr. Hoffer's office, it was about the 12th of June—I saw Mr. Hoffer and we discussed the situation. * * * We just discussed the conditions that I would be up against out there, and the situation as I would find it out there. * * * He said that he thought we could get pay at 1,800 feet. That was what he referred to in the contract when he said: 'The depth discussed with you this morning' or in substance around 1,800 feet.

"In our conversation we discussed a deeper depth, but he figured that we would get the pay sand at 1,800 feet. I do not know at what other depth he figured I might get the pay sand. I knew the Hoffer Oil Corporation had a contract with the lessors by which it was bound to drill 3,500 feet unless pay was found at a lesser depth; and that he was obligated to drill 3,500 feet, yes, yes, sir, I was obligated to stay there.

"As to his saying in this letter 'you agree to take care of this work, furnish all of the labor necessary for the completion of this well to the depth that we wish to go, which will not exceed 3,500 feet'—yes, sir, and I would be there yet if we had not got to 3,500 feet and he had desired to go on. I would have gone on if I had been given a chance to. I am ready to go back there now if they are. My contract was to go 3,500 feet or wherever they stopped paying the bills. The contract recites a consideration of $5,000, the way I have it; $2,450 has been paid on it; I think $2,700, possibly."

T. B. Hoffer, president of the Hoffer Oil Corporation, who made the contract with appellee, testified as follows:

"At the time of making the contract Mr. Hughes and I discussed with respect to the depth that the well was to be drilled. The discussion was that we had an agreement to take the well to 3,500 feet. I also discussed

with him the possible depths at which I thought we might obtain oil. I thought there were several depths at which we might get oil and gas. I think at the depths of 1,400 and 1,800 and 2,400 feet, and between 3,200 and 3,500 feet. In this letter I say, 'You agree to take care of this work, furnish all labor necessary for the completion of the well to the depth we wish to go, which will not exceed 3,500 feet, and the possible depth as discussed with you this morning'—well, the depth I discussed with reference to that was 3,200 feet or 3,500 feet, as shown above—now that was after both of us had discussed with the geologist, who was of the opinion that we would get some horizon, at or about that depth we ought to pick up something, and that there would be a final depth to get production if we failed to get it in the upper sands. In other words we figured that if we were disappointed at one depth we still had a chance at another depth. At the time that I made the contract with Hughes the depth we wished to go was 3,200 feet or 3,500 feet, or until we had found oil or gas. * * * I discussed with him the possible depth of 1,800 feet. We discussed that with other depths."

The drilling of the well was abandoned at 1,590 feet, on account of the evident fact that it was very expensive to go further because of the alkali water, as shown by the letter of appellee to Mr. Moss, of August 31, 1925. The evidence shows that the last work on the well was either in October or November, 1925. Hoffer testified:

"Why was this well not completed? The principal reason was because it was impracticable to carry it on with the rotary tools; it would be better drilled in with cable tools; we had trouble with the water up there, very serious trouble. That had something to do with our abandoning the well up there; water conditions up there made it so that the cost would have been practically impossible to have gone ahead and drilled with rotary tools up there, and we abandoned the idea of finishing it with rotary tools and we would have been out considerable money in drilling the well in that way to the required depth, even if it were practicable."

■ In construing a contract, the cardinal rule is to ascertain the intention of the parties. Their intention is to be ascertained from the words used in the contract, construed in the light of the facts and circumstances surrounding the parties at the time it was made, and not in the light of subsequent unforeseen facts and circumstances, and in light of the purposes sought to be accomplished by the making of the contract. House v. Faulkner, 61 Tex. 311; Astugueville v. Loustaunau, 61 Tex. 237; Stone v. Robinson (Tex. Civ. App.) 180 S. W. 135, writ of error refused; May v. Southwestern Lumber Co. (Tex. Civ. App.) 278 S. W. 508, writ of error refused; First National Bank v. Shaw, 260 S. W. 309, by the Waco Court of Civil Appeals.

■ Whether the language of the contract be ambiguous or not, in ascertaining the intention of the parties, the surrounding facts and circumstances and the purposes sought to be accomplished by its making should be considered. Dublin Elec. & Gas Co. v. Thompson (Tex. Civ. App.) 166 S. W. 113; Reed v. Ins. Co., 95 U. S. 23, 24 L. Ed. 348.

In Dublin Electric & Gas Co. v. Thompson, supra, suit was filed against the Dublin Electric & Gas Company for failure to furnish Thompson a sufficient amount of water for fire protection. The evidence showed that plaintiff was a resident of the town of Dublin and that defendant was operating a water plant in said town; that the defendant, through its manager and agent, had for a valuable consideration contracted with plaintiff "to furnish appellee all the water he wanted for all purposes at all times"; that on the date stated his house caught fire, which was discovered by the plaintiff in its incipiency; that he attached a hose to a hydrant in the yard with which he could and would have extinguished the fire had there been water, but there was none in the pipes, by reason of which he was unable to extinguish the fire and his house and contents were totally destroyed. Defendant answered that the water service contemplated in the contract was for domestic purposes and to be in quantity suitable for such purposes only; that the defendant company was not authorized to enter into a contract for fire protection, nor was it engaged in the business of furnishing water therefor to private patrons; that the agent through whom the plaintiff alleged the contract had been made was but a local agent and wholly unauthorized to make any such contract as alleged. The court said:

"It cannot be said that the appellant company expressly contracted to furnish water at times and in sufficient quantities to extinguish fires. The plaintiff himself testified that, at the time of the conversation and agreement upon which he relies as establishing the contract alleged, the word 'fire' was not used, nor did he have his mind on that subject. To the same effect was the testimony of Karmany, the local manager. So that the contract, as plaintiff alleges it, is one of inference only from the use of the very general terms that plaintiff was to have water 'for all purposes.'

"While as a general rule the terms of a contract are to be given their full effect and meaning, yet the ruling object is to ascertain the intention of the parties, and hence their situation, the subject-matter, and other circumstances may be looked to in determining the meaning of the terms used, although the terms are not in themselves ambiguous, and a party will be bound by that meaning which he knew the other party to

the contract supposed the words to bear. San Jacinto Oil Co. v. Fort Worth Light & Power Co., 41 Tex. Civ. App. 293, 93 S. W. 173. It seems evident to us that the purposes of the parties in mind at the time was that water was to be furnished for all ordinary domestic purposes, and that it was not intended as an agreement that water should be furnished, for extraordinary purposes. Neither the service pipes, hydrants, hose, or other circumstance, tends to show that it was ever the purpose of the company, or the expectation of the plaintiff, that the water to be furnished to him should be at times and in quantities sufficient to prevent the destruction of his premises by fire."

In this case, this court sustained the contention of appellant that a peremptory instruction should have been given, and reversed and rendered the judgment for appellant. It does not appear that this case ever went to the Supreme Court.

A court will not construe a contract so as to render it inequitable or oppressive to either party in its operation if such a construction can be avoided. Stone v. Robinson (Tex. Civ. App.) 180 S. W. 136; Rodgers v. Rodgers, 206 Ky. 515, 267 S. W. 1083. In construing a contract, effect must be given to every part. Where the language of a contract is capable of two constructions, the court will not adopt the oppressive one. Luten Bridge Co. v. Grant County, 206 Ky. 528, 267 S. W. 1082.

Hoffer testified that he and Hughes discussed the matter as to the probable depth the well would have to be drilled; that they had an agreement that they would not go beyond 3,500 feet; that he told Hughes that he thought they might strike a paying sand at 1,400 feet, at 1,800 feet, at 2,400 feet, and between 3,200 and 3,400 feet; that in the expression in the letter to Hughes that, "You agree to take care of this work, furnish all of the labor necessary for the completion of this well to the depth that we wish to go, which will not exceed 3,500 feet, and the possible depth as discussed with you this morning," he had in mind the various depths discussed by him and Hughes in their conversation the day before, after both he and Hughes had discussed the matter with the geologist and they had all concluded that they ought to get a paying sand at one or more of the depths indicated. Hoffer further testified:

"It is not a fact that Mr. Hughes at all times, up to the receipt of my letter, advised us by letter and by phone that he had his crew standing ready to go on at all times, to go on with the contract so far as I desired to carry it out—no, sir; Mr. Hughes, by telephone, and I believe by correspondence with Mr. Moss, told us that it was awfully tough business, and expensive business, and the sooner we could get off of it the better

it would be; he was there at our command; he made no offer to go ahead, but was there to do whatever we told him to do."

In spite of the statements in the letter indicating that Hughes was supposed to furnish the rig, and be able to furnish small parts of such material as might be needed in addition to that then on the ground, and to furnish all the labor necessary for the completion of the well to the depth that "we wish to go, which will not exceed 3,500 feet, and the possible depth as discussed with you this morning," the record discloses that the Hoffer Oil Corporation paid practically all of the expenses. Appellant insists that the use of the present tense of the verb "wish" indicates that both parties to the contract had prior to that time discussed the depth they would probably have to go, and it was with reference to these depths not to exceed 3,500 feet that this letter and the contract was written. The Hoffer Oil Corporation was engaged in the oil business, including the drilling of oil wells, and desired to drill a test well for oil and gas in King county, in what is commonly termed "wildcat territory." Appellant insists that it is common knowledge that the drilling of oil wells is an expensive business, and that by reason of this fact one does not undertake to drill such a well without first ascertaining whether there is any structure in that particular locality that will likely produce oil, and the depth at which it is likely to be produced, as was done and discussed between the parties in this case; that when such facts are ascertained the contract made for the drilling of such well by its very nature compels the assumption that the party contracting for the drilling of the well wishes it to be drilled to a depth at which oil and gas can be procured in paying quantities; that this assumption is indulged even in contracts which do not provide the depth to which the well is to be drilled. Gray v. Merritt, 276 S. W. 187, by the Commission of Appeals, approved by the Supreme Court.

Appellant urges that the contract is unambiguous and is not susceptible of the construction given it by the trial court. But, whether ambiguous or unambiguous, it should be construed in the light of the facts and circumstances surrounding the parties at the time the contract was made, and the purpose sought to be accomplished by its making. In Reed v. Insurance Co., 95 U. S. 23, 24 L. Ed. 348, it is said:

"Although a written agreement cannot be varied (by addition or subtraction) by proof of the circumstances out of which it grew and which surrounded its adoption, yet such circumstances are constantly resorted to for the purpose of ascertaining the subject-matter and the standpoint of the parties in relation thereto. Without some knowledge derived from such evidence, it would be im-

possible to comprehend the meaning of an instrument, or the effect to be given to the words of which it is composed. This preliminary knowledge is as indispensable as that of the language in which the instrument is written. A reference to the actual condition of things at the time, as they appeared to the parties themselves, is often necessary to prevent the court, in construing their language, from falling into mistakes and even absurdities. * * * 'It may, and indeed ·it· often does, happen, that, inconsequence of the surrounding circumstances being proved in evidence, the courts give to the instrument, thus relatively considered, an interpretation very different from what it would have received, had it been considered in the abstract. But this is only just and proper; since the effect of the evidence is not to vary the 'language employed, but merely to explain the sense in which the writer understood it.'"

■ Though appellee alleged and testified that he was ready and willing at all times to complete the well he contracted to drill for appellant to a depth of 3,500 feet if necessary, and though he testified that in the conversation with Hoffer he asked, "Where do you think you will get pay," and Hoffer replied, "Around 1,800 feet," and he said, "Where would I be at then," and Hoffer replied, "That would have no bearing on you, whenever we stop the well, then your money is due," yet in determining whether or not a peremptory instruction should be given, the testimony of appellant's witnesses must be looked to, and appellant's evidence, including all the facts and circumstances surrounding the making of the contract, must be considered in determining whether or not a peremptory instruction was authorized. If the contention of appellee that he is entitled to recover the full amount of compensation mentioned in the contract, upon the stopping of drilling by appellant, even if the well had been drilled only 100 feet, and such construction is the only one the language of the contract justified, then no error was committed in giving the peremptory instruction. But if there is a reasonable doubt as to whether this construction is necessary or not, in· view of the evidence of appellant, and the surrounding circumstances, then the trial court erred in peremptorily instructing a verdict for the plaintiff. It will be noted that the plaintiff sued on the contract for recovery of the balance due, amounting to $2,550. He did not sue on quantum meruit, that is, on the value of the services rendered, nor on a breach ·of contract. The service he was to perform under the contract, as substantially construed by the parties, was only that of an overseer or superintendent.

■ It is not in every case of an unwarranted discharge of· an employee that such discharged employee can recover the full amount of his wages or salary for the unexpired term of his employment. Ordinarily, he can recover only the loss he has sustained by reason of such discharge, and he must show that he has used diligence to secure other employment during the unexpired term. The employee is held liable for such wages or salary as he did receive during the unexpired term, or such as he might have received by the exercise of due diligence.

In Meade v. Rutledge, 11 Tex. 44, where an overseer was employed during the fall of 1847 for a period of one year and was discharged on January 1, 1848, and sued to recover as damages for breach of contract the full contract price, alleging that he was ready and willing at all times to perform his part of the contract, our Supreme Court said: "If the offer, by an overseer, to perform service, is equivalent,· in every respect, to actual performance, he might, without doing duty for a day, recover wages for the year—although perhaps he may be engaged during the year elsewhere in some employment equally or perhaps more profitable—or might have been engaged, had he made any attempt to procure employment. This would be too monstrous to be sanctioned by any sound principles of law or rules of equal justice." See Porter & McMillan v. Burkett, 65 Tex. 383; Osage Oil & Refining Co. v. Lee (Tex. Civ. App.) 230 S. W. 518, writ of error refused; Hood v. Raines, 19 Tex. 400; Enterprise Co. v. Neely (Tex. Civ. App.) 217 S. W. 1088.

■ In the last-cited case the El Paso Court of Civil Appeals said: "The plaintiff cannot recover on an entire contract by proving part performance without allegations authorizing recovery upon a quantum meruit." See, also, Gazette Publishing Co. v. Cole, 164 Ark. 542, 262 S. W. 985.

■ We think that the contract sued on, according to recognized rules of construction, is susceptible of the meaning that appellee agreed to drill the well to a depth not to exceed 3,500 feet unless oil or gas was procured in paying quantities at less depth, and that the evidence raised an issue of fact as to whether or not such was the intent of the parties at the time the contract was made, and it was error for the trial court not to submit this issue to the jury.

■ In Taylor v. McNutt, 58 Tex. 71, it is said: "When the effect of a writing does not depend entirely upon the construction or meaning of its ·terms, but upon extrinsic facts and circumstances, then it becomes the duty of the court to submit for the consideration of·the jury the instrument, together with the attending facts and circumstances adduced in evidence, with such instructions upon the legal effect of the instrument as will meet the various phases presented by the extrinsic evidence." See Lemp v. Armengol, 86 Tex. 690, 26 S. W. 941.

We conclude that the trial court erred in

giving a peremptory instruction, and the judgment below is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.