## Life & Casualty Ins. Co. of Tennessee v. Deaton.

(Decided Oct. 28, 1938.)

BARBOUR & BASSMAN for appellant.

L. J. CRAWFORD and MARION W. MOORE for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Reversing.

This case is here on second appeal. See 264 Ky.
507, 95 S. W. (2d) 10. That appeal was prosecuted
from a judgment in favor of appellee on a contested in-
surance contract held by him in appellant company.

We did not have the policy before us in that case,
nor do we now have it, but its absence makes little dif-
ference since, as shown in the former opinion and as
now appears, parties apparently agree upon its provi-
sions as written and delivered to appellee.

A reading of the former opinion will give the facts
and points argued, and will show that the policy was
rather restricted in its terms. It is what is known as a
"travelers and pedestrians" policy, insuring alone
against accidents arising to travelers and pedestrians.
It provided for a payment of $500 for the loss of an eye.
The pleadings in this case do not differ from the plead-
ings in the former case, except in the instance which we
shall point out.

In the former case appellee contended that the
agent of appellant had represented to him in the sale,
and on delivery, that the policy was a general accident
policy, covering any and all accidental injuries, no mat-
ter when, how and where received; that he believed, as
was represented to him, that the policy covered occupa-
tional injuries, when as a matter of fact it did not, and
due to the fact that he was unable to read, he relied
solely upon the agent's representations. Asserting that
the agent's act bound the insurer he plead that appel-
lant was estopped to deny liability.

On the first trial the court overruled insurer's de-
murrer to so much of the pleading as set up estoppel,
and we reversed the case, holding the question to be
decided was, whether the contract as written included
the entire contract as agreed upon between the parties,
or whether a portion was left out by fraud or mutual
mistake. We found no allegation that the part of the
contract alleged to have been agreed upon was left out

of the policy by fraud or mutual mistake. Neither was it sought by appellee to have the contract reformed.

We held the rule to be that where the pleadings manifested an issue as above indicated, plaintiff's remedy was by petition to have the contract reformed rather than by a plea of estoppel in a law action. (Cases cited in former opinion.)

On the return of the case appellee filed a substituted petition in which he plead fraud and mistake, and prayed for a reformation of the contract and for judgment for $500. The appellant answered, denying in apt terms the allegations of the petition, and further plead in two separate paragraphs. In the first it set out substantially the terms and conditions of the written policy, and plead that the injury received by appellant was not covered by the policy, and that the insured so understood when the policy was written and delivered. It then plead the lack of authority or power of the agent to alter or change the terms of an insurance agreement.

The court sustained appellee's demurrer to paragraphs 2 and 3; as to the correctness of this ruling there seems to be no argument, since the sole issue was clearly raised by the allegations of the petition and the first paragraph of the answer.

Depositions were taken, and upon submission of the whole case the chancellor reformed the policy "So as to make it express the true terms of the contract—viz: That the plaintiff would be entitled to the benefits of the policy in the event he should be killed or injured while engaged in the regular course of his employment," and entered judgment against the insurer for $500 with interest, and this appeal followed.

There is apparently no dispute between the parties that the delivered policy did not cover the accidental injury received by appellee while doing some riveting, in the regular course of employment at the Newport Rolling Mills, which injury later resulted in the loss of one eye. The only question presented to the court below, and to this court, is whether or not the agent fraudulently sold him one contract and later delivered one not in accord with the agreement, and whether or not appellant's reliance upon the representations alleged was excusable. The conclusion turns solely on a consideration of the proof.

The policy was issued in March, 1932, upon application of appellee, then about thirty years old, through James M. Sowell, insurance salesman for appellant. He had insured a man named Taylor Smith who lived in the same house with appellee, and was there on the occasion collecting premiums. Appellee's testimony is to the effect that when he arrived home he found Mr. and Mrs. Ely Hornsby. When Deaton arrived he says Sowell was trying to sell Hornsby some insurance, but the latter was not interested. He then sought to sell appellee a policy. In relating the transaction the appellee said:

"He asked me about insurance, and I told him I had a pretty good bunch, and he said he had one he would like to sell me. I asked him what it was and he said 'sick and accident.' I asked him if it would pay for any accident, and he said it would. He asked me what work I did and I told him. I asked him if it would cover me anywhere I was hurt and he said it would. He said it wouldn't make any difference where I was hurt. * * * I said I got a job and asked him what kind of insurance he had, and he said 'sick and accident'; he went on to say it paid for sick and accident, no difference where. I said I was working for the Newport Roller Mills, would it cover me there, and he said, 'Yes, it will cover you anywhere.' When the policy was delivered I asked him if it paid for any accident, and he said just exactly as I told you."

Mrs. Hornsby said that the agent "represented the insurance company to Mr. Deaton and tried to sell him insurance. * * * Deaton told the agent he wanted sick and accident. I don't remember exactly how much would be paid if he was sick, but he said any accident—he told him he would get $500.00. * * * He said he worked in a dangerous place, and the agent said it would cover any kind of sickness or accident, and it made no difference where he worked."

It will be noted here that this witness apparently states some alleged conversation to which appellee did not refer.

Ely Hornsby said, referring to the agent:

'He told him this was an accident policy, and Mr. Deaton asked him the question, 'would it cover my job? and he said, 'Where do you work?' Mr. Dea-

ton said at the Rolling Mill, and he said 'What do you do down there?' and he said, 'I am a tinner's helper, roof-man,' and he said, 'Yes, it covers your job wherever you are at.''

It will be noted here that this witness goes much further in detailing the conversation than appellee or Mrs. Hornsby. Still further, this witness said in answer to a leading question: ''And told him that it specifically provided that it would pay off in the event he was hurt in his employment?'' The witness answered, ''Yes.''

Appellee made no such statement, nor did Mrs. Hornsby say that such a question was asked or statement made.

It is apparent that there was not enough said by appellee to indicate to the agent that he was seeking accident insurance to cover him in his alleged ''dangerous employment,'' or his employment at the mill. It is to be noted that Sowell had been trying to sell the same sort of policy to Hornsby before appellee came in. Hornsby seems to have understood fully the policy that Sowell was trying to sell him. The agent did not discuss any other policy with Hornsby, and Hornsby informed the agent that he was not interested in any insurance whatever.

''He also talked the same way to Deaton,'' and when the witness was asked why he did not tell Deaton that the contract was no good, he said: ''It wasn't any of my business. If Mr. Deaton had asked me about it I would have plainly told him, as I did the agent, that it did not sound good to me.'' He says that this conversation was with the agent before Deaton came in.

Sowell testifies that he was in the house collecting from a policyholder, who told him there was a man living there who was interested in these policies, and he later called on Deaton. He states that Hornsby and wife were not there. He explained to Deaton the policy which covered injuries while traveling. He says he did not discuss with Deaton a policy which would protect him while working at the mill, except to say that such a policy would cost him ''far more money.'' He says that Deaton told him where he worked in order to fill out the application form, which shows: ''Occupation, Mill Work.''

It is shown by the proof that the policy which appellee received cost only five cents per thousand per week. This would amount to $2.60 per year on each thousand dollars to be paid in case of accidental death. This application was for the sum of $1,000. We do not have the policy, but assume the correctness of the statement that it paid $500 for the loss of one eye. It was shown that the mill was operated under the Compensation Act; Kentucky Statutes, section 4880 et seq.; that appellee had a mutual aid policy on which he said paid $10.50 a week for sick and accident benefits and $1,500 for death. For this mutual policy he paid $1.85 per month. He also had what is known as "burial insurance," which cost him ten cents for himself and five cents per week for the children.

It is admitted by all parties that appellee could not read or write. His application was signed by a mark. However this may be, it is apparent from a reading of his testimony that he is a man of at least ordinary intelligence, and understood enough about insurance to realize that he could not procure such a policy as he now claims was to be delivered to him, at the low rate of five cents per week per thousand. This is a circumstance which must be taken into consideration when we come to consider the propriety of reforming the contract. It may be noted that appellee says that Taylor Smith lived with him, and the solicitor was there collecting insurance premiums from him. The agent says he was told by some one who lived in the house, and from whom he was collecting a premium, that Deaton was interested in "these" policies. Appellee says Smith was present when the application was made and told him it was good insurance. Smith did not testify on this trial. These circumstances, when taken together with the evident fact that appellee does not make it clear that the agent represented, or that he believed he was to receive a policy which would cover an accidental injury received while in the regular course of employment, hardly justify the court's action in reforming the contract. The proof is far from being clear or convincing.

We have frequently laid down the rule, which we apply in such cases:

"The proofs [must be] full, clear and decisive. Mere preponderance of evidence is not enough;

the mistake (or other ground) must appear beyond reasonable controversy.'' McNabb v. South Eastern Gas Company of West Virginia, 268 Ky. 532, 105 S. W. (2d) 622, 624, which cites several cases to the same effect.

We have also held that in weighing the evidence, which must be clear and convincing, we are not confined to the ''express statements of witnesses,'' but the weight to be given may be tested by the character of testimony, coherency of the entire case, documents, circumstances and facts. Rodgers v. Rodgers, 206 Ky. 515, 267 S. W. 1083.

Taking into consideration the well formulated and applied rules, in giving weight to evidence where an alleged fraudulent act is relied upon to set aside or reform a contract, we are of the opinion that appellee failed to carry the burden which the law places on him.

Summed up, this case comes down to the contention that the solicitor sold appellee an all-coverage policy, and discovering, when he first learned that appellee could not sign his name to the application, concluded to and did deliver to him the limited travelers and pedestrian policy. If this happened the agent was guilty of a fraud, which under the facts and circumstances, as we view them, could easily have been discovered. A slight inquiry on the part of appellee would have indicated to him the exact nature of the policy. He did not investigate, though if Hornsby's statements are true, he was contracting for an all-coverage accident, and according to appellee, coverage for sickness, at what any reasonably intelligent person would know was a ridiculously low rate for the benefits provided.

''One who signs contract is presumed to know its contents even though he is illiterate, since, if such person is unable to read, he is negligent in failing to have contract read to him.'' Warfield Natural Gas Company v. Endicott, 266 Ky. 735, 99 S. W. (2d) 822, 826.

We are unwilling after reviewing the evidence in its entirety, and giving consideration to all the facts and circumstances developed, to open the door as wide as we would be compelled to do if we followed the chancellor

in his reformation of this contract. We must hold that he was in error in so doing.

Judgment reversed, directing the entry of one denying the reformation.