**WESTERN INDEMNITY CO. v. SOUTHERN SURETY CO.  (No. 136–3041.)**

(Commission of Appeals of Texas, Section B. June 26, 1920.)

**1. Contracts ⬡147(2)—Construction of language in ordinary sense to determine parties' intention.**

The court's only function is to construe the language of the contract in the sense in which such language is ordinarily used, putting itself in the position of a contracting party and keeping in view the nature of the business and the end sought, and determine what contract the parties made, consistently, if possible, with their intention, but not what contract they had in mind to make or thought they had made.

**2. Contracts ⬡233—Agreement for transfer of business construed with respect to expenses.**

A contract by which plaintiff surety company transferred its business to defendant surety company construed to place the obligation upon plaintiff to pay all expenses of getting both new and old business for the specified period of time, the plaintiff being entitled to no credit therefor beyond the 35 per cent. general agency commission.

**3. Contracts ⬡229(2)—Agreement for sale of business with respect to division of returns.**

A contract by which plaintiff transferred its surety business to defendant under agreement to continue its sales agency, plaintiff to act as general agent for a time, construed as requiring a percentage division of the returns on the "excise business" on the basis of the "gross premiums," as the term is defined in the contract, for an entire year.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Suit by the Western Indemnity Company, as successor of the Federal Union Surety Company, against the Southern Surety Company. Judgment for plaintiff, and defendant appealed to the Court of Civil Appeals, which reversed the judgment and rendered judgment for defendant (190 S. W. 837), and the plaintiff brings error. Judgment of the district court and· of the Court of Civil Appeals reversed, and judgment rendered for defendant.

Love & Taylor and Carden, Starling, Carden, Hemphill & Wallace, all of Dallas, for plaintiff in error.

Arthur G. Moseley, of St. Louis, Mo., and Jno. T. Suggs, of Denison, for defendant in error.

**Statement of the Case.**

KITTRELL, J. The purpose of the action out of which this appeal arose was in effect to obtain the construction of a contract.

On the 18th day of May, 1912, in the city of St. Louis, Arthur G. Moseley, as attorney for the Southern Surety Company, addressed a proposition in writing to Thos. B. Love, as attorney of the Federal Union Surety Company, which proposition was by said Love, on behalf of his client, accepted in the terms in which it was made. The contract was to begin on June 15, 1912, and expire on June 16, 1913, and when it expired, and it was sought to adjust the matters of reciprocal liability thereunder and ascertain how much was due to or by the parties under separate and respective parts relating, to different kinds of insurance, the companies could not reach an agreement. Though both the attorney who submitted the proposition and ·the attorney who accepted it were lawyers of recognized ability, and especially familiar with all the technicalities of the insurance business, they were unable to agree on an interpretation of their own handiwork; hence resorted to the courts to get the contract construed.

It is but just to both sides to say that there is no charge or claim on the part of either that the other has been guilty of any conscious purpose to repudiate its contract, or that it is endeavoring to avoid compliance with any obligation resting upon it by virtue of the contract as the party in good faith construes it. The whole controversy arises out of a difference of opinion as to what the contract means.

It is proper to state just here that though the plaintiff in error, Western Indemnity Company, was not a party to the original contract, it at some time subsequent to the date of the contract became, in some way not revealed by the record and not material to be known, substituted to all the rights, benefits, responsibilities, and remedies of the Federal Union Surety Company, which company was plaintiff in the trial court and will be so referred to in this statement and in the opinion, and such reference will be understood as referring also to the Western Indemnity Company; while the Southern Surety Company will be referred to as the defendant. The Federal Union Surety Company was engaged in business in Indianapolis, Ind., and the Southern Surety Company was engaged in the same business in St. Louis, Mo.; that is to say, the two companies had their offices respectively in the cities named.

The contract made, as stated on May 18, 1912, provided in the first paragraph that—

"The Federal Union Surety Company is to turn over and transfer and deliver to the Southern Surety Company its surety business and good will, not to include, however, any contracts already entered into."

Second:

"The Federal Union Surety Company is to turn over to Southern Surety Company its agency force, and is to use its best endeavors in good faith to cause its present agency force to become and remain agents for the Southern Surety Company."

⬡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

There are many other provisions, but to avoid repetition they will be set forth only in the opinion.

The trial court interpreted the contract in the light of an agreed statement of facts, as contended for by plaintiff. The Court of Civil Appeals disagreed with the trial court and rendered judgment for defendant on its cross-action in a sum practically the same as the trial court had given plaintiff judgment for. The Supreme Court granted a writ of error, which at least suggests a doubt upon its part of the correctness of the interpretation put upon the contract by the Court of Civil Appeals.

## Opinion.

It would be difficult, if not indeed impossible, to make clear our interpretation of the contract, without setting forth in the terms in which they were written certain parts of the contract, as any summary or paraphrase might fail to fairly set forth some controlling provision. The first and second paragraphs or sections have been set forth in the preliminary statement of the case.

The third paragraph or section reads as follows:

"Federal Union Surety Company shall establish and maintain at its own expense at Indianapolis a state agency for Southern Surety Company for the term of one year beginning June 15, 1912, which agency is to co-operate with Federal Union Surety Company in turning over the agency force and business aforesaid of Federal Union Surety Company to Southern Surety Company, and is to receive and transmit to Southern Surety Company for such time as may be agreeable to Southern Surety Company reports and remittances from all of the agency force aforesaid so turned over, and shall have the right for one year from and after the acceptance of this proposition to receive and transmit to Southern Surety Company the reports and remittances from the agents aforesaid located in the state of Indiana; it being contemplated that such agency will constitute a medium through which the transfer of the business and agents aforesaid will be effected, all expense to be borne by the agency."

As the first and third paragraphs or subdivisions of section 5 relate to the Indiana business, as does the third paragraph just quoted, we will set them forth at this point immediately following the third paragraph. They read as follows:

First paragraph, section 5:

"Fifth. Southern Surety Company will use its best efforts to secure and continue the surety business heretofore conducted by Federal Union Surety Company which may be acceptable to Southern Surety Company and will pay to Federal Union Surety Company, for business that Southern Surety Company may write within one year through any of the aforesaid agents, or through the General Agency to be established by Federal Union Surety Company at Indianapolis, as aforesaid, of the following classes, namely (a) bonds in substitution or renewal of Federal Union Surety Company bonds; (b) the first bond written by Southern Surety Company for persons who have heretofore, within 12 months prior to June 15, 1912, patronized said Federal Union Surety Company by contracting to pay to it any premium on account of a bond executed by it, 35 per cent. of the gross premiums received therefor by Southern Surety Company, which means the total gross premiums less returned premiums, cancellations, and that portion of the premiums received which may be paid out for reinsurance."

Third paragraph, section 5:

"And Southern Surety Company will pay to Federal Union Surety Company upon new business that may be written by Southern Surety Company through the agency to be established by Federal Union Surety Company as aforesaid, within one year from June 15, 1912, that may arise within the state of Indiana, a general agent's commission of 35 per cent. of the gross premiums received, all expenses of procuring such new business, and all agents' commissions therefor are to be paid and borne by said agency, or said Federal Union Surety Company; it being understood that the new business herein referred to is not of a class or kind that may be embraced in any of the classes of business heretofore mentioned."

The second paragraph of section 5 relates to what, for convenience of expression, will be termed the "New York excise business," which will be later explained and dealt with.

It will be observed that by the first paragraph of section 5 the defendant bound itself to pay "35 per cent. of the gross premiums," as that term is defined, for writing those certain kinds of business designated (a) and (b), and that nothing is said as to any further sum being directly or indirectly paid, nor is anything said about expenses.

It will be further observed that in the third paragraph or subdivision of section 5 the business therein referred to is designated as "new business," while both parties in their briefs refer to the business described as (a) and (b) in the first paragraph or subsection of section 5 as "old business"; a fact indicated by its evident character. It is likewise made clear that it is in the third paragraph of the contract the object of the contract is set forth, and that "all expense (is) to be borne by the agency"; but as to the character of the agency the language does not appear to be as felicitous and clear as is desirable.

The language used is such as to make it difficult to determine whether the Federal Union Surety Company and "the agency to be established" are meant to be treated as one concern, or whether the use of the words "which agency is to co-operate with the Federal Union Surety Company in turning over the agency force and business aforesaid of the Federal Union Surety Company to the Southern Surety Company," etc., implied that

the Federal Union Surety Company and the agency are to be treated as distinctly separate parties, so as to compel the application of the term at the end of the section, or paragraph (3), "all expense thereof to be borne by agency" to the agency as contradistinguished from the Federal Union Surety Company.

The language in the third paragraph or subsection of section 5, "through the agency to be established by Federal Union Surety Company as aforesaid," and the concluding portion of the same paragraph (3) of section 5, "all expenses," etc., "to be paid and borne by said agency, or said Federal Union Surety Company," etc., would seem to indicate that the "agency to be established" and the "Federal Union Surety Company" are intended to be treated as synonymous and convertible terms meaning one and the same thing, and not two separate business entities.

The importance of the question under discussion becomes apparent when it is stated that the parties agreed, in the stipulation of facts upon which the case was tried, that the total premiums arising by virtue of the contract (exclusive of "New York excise" premiums), and which were collected by Federal Union Surety Company, amounted to $42,-395.56. The figures, with all credits claimed to be proper by defendant, are set forth in the stipulation, but are not necessary to be set forth in this opinion.

The balance which the defendant claims is due it after allowing such credits as it admits are correct is $10,380.41. Plaintiff admits that the debits against it are correct, but denies that it is given credit for a proper amount, claiming that it is, under a proper construction of the contract, entitled to a further credit of $5,360.19, which it claims to have paid out to such agents on "old business," which would reduce its debit to defendant to $5,020.22. The defendant agrees that the amount of the credit claimed is correct: that is, that the plaintiff incurred the expenditure, but contends that the plaintiff is not entitled to credit itself with, and in consequence charge defendant with, the amount of $5,360.19, because, as defendant contends, the contract means that plaintiff should pay the subagents out of the 35 per cent. gross premiums.

The solution of this question depends upon what is the correct construction of what may be termed, for convenience of expression, the Indiana branch of the contract. The solution of the question is by no means free from difficulty. The difficulty is attributable to the fact that the parties who made the contract were both evidently familiar with the insurance business, and both understanding, or thinking they understood, the meaning of the contract, and each, believing that the other understood it as. he himself did, left certain things unsaid, which, while not necessary to be said in so far as they were concerned, were necessary, or at least desirable,

to have been said so far as others not as familiar as they were with the insurance business were concerned. It is evident from the briefs and the printed arguments which are made a part thereof that each party believed that the construction put upon the contract by the other would result inequitably and unfairly, and would give the opposing side a greater benefit than it is entitled to under the terms of the instrument.

[1] Whether this be true or not we are not at liberty to consider. Our only function is to construe the language of the contract in the sense in which the language is ordinarily used, putting ourselves in the position of the contracting parties, and keeping in view the nature of the business they had in hand and the end sought to be achieved, and thereby determine what contract the parties in fact made, giving it, if possible so to do consistently with recognized rules of construction, a meaning which the parties intended it should express. If it appears that they have not said in the writing something necessary to have been said in order to give full expression to what either or both had in mind, and what was necessary to make clear what they meant to say, we must nevertheless determine, not what contract they had in mind to make, or what they thought they had made, but what contract they actually did make. All their thoughts, plans, purposes, and intentions are conclusively presumed to be embodied and expressed in the written contract. If what they meant was clear, no construction would be necessary at our hands.

[2] If our conclusions that "the agency to be established" and the "Federal Union Surety Company" are properly to be considered as meaning one and the same thing, it follows that the contracting party that was selling, or at least transferring, certain business, which was the Federal Union Surety Company, was one party to the contract and the Southern Surety Company was the other. This being true, and it being that twice in paragraph or section 3 of the contract the obligation to bear the expenses is put on the Federal Union Surety Company, and that in paragraph or subsection 3 of section 5 it is said that "all expense of procuring such new business and all agents' commissions therefor are to be paid and borne by said agency, or said Federal Union Surety Company,", that is, should be paid by it out of the 35 per cent. commission which defendent was to pay it, and that in the first paragraph of section 5, where the defendant agrees to pay plaintiff 35 per cent. nothing is said about paying expenses to subagents, we are of the opinion that plaintiff did not have the right to take any greater part of the money it collected than 35 per cent. for either line of business, and is not entitled to receive credit for any amount in excess of 35 per cent., and that it must bear the expense of the $5,360.19 which it paid to subagents, or, in other words, pay it

out of the 35 per cent. commission. This being true, the balance due by it to the defendant on the Indiana business is as claimed by defendant, to wit, $10,380.41.

Reference back to paragraph 1 of section 5 of the contract will disclose that it is said therein that the Southern Surety Company will pay, not "to the agency to be established as aforesaid," but to "Federal Union Surety Company," 35 per cent. of the gross premium received; and reference back to the third subdivision or paragraph of the same section will disclose that the language is:

"Will pay to Federal Union Surety Company upon new business that may be written by Southern Surety Company under the agency to be established by the Federal Union Surety Company .* * * 'a general agent's commission of 35 per cent.' " etc.

It appears to us that two conclusions must inevitably be drawn from the language of the third paragraph quoted above: First, that the defendant was dealing with the Federal Union Surety Company as a distinct corporate entity of which the agency was in fact but a mere medium or subagent, which it was contemplated would be employed to attain the end the Federal Union Surety Company had contracted to accomplish; and, second, that 35 per cent. was understood to be the percentage of a "general agent."

We would be at liberty, if it were necessary to determine the question in hand, to write in before the words "35 per cent.," where it refers to payment on "old business," the words "a general agent's commission of," just as they appear in connection with the matter of paying for "new business" in paragraph 3 of section 5 of the contract. If this interpretation of the contract be correct, then plaintiff, was to all legal intents and purposes but the general agent of defendant, and, unless there was some express stipulation to the contrary, was under the obligation to pay the expense of employing subagents, who were its agents, which it had promised to employ as a means of establishing and maintaining "at his own expense an agency."

This is true, both because the contract in so far as it relates to the "old business" does not say anything about expenses, and there can· be nothing implied from the language used, either when taken alone or in connection with any other part of the contract, which would, or could, change the general rule that unless it is otherwise agreed the "general agent" must pay his or its subagents. Williams v. Moore, 24 Tex. Civ. App. 402, 58 S. W. 953; Nat. Cash Register v. Hagan, 37 Tex. Civ. App. 281, 83 S. W. 727.

In the brief of neither party is the meaning or effect of paragraph or section 3 of the contract discussed; indeed, that section is not referred to, but plaintiff invokes the aid of the maxim "Expressio unius est exclusio alterius." (The expression of one is the exclusion of another.) It contends that since in subsection 3, section 5, it is specially provided that ·plaintiff shall bear all the expense of procuring new business, while in the first paragraph of the same section, where the same per cent. is contracted to be paid, nothing is said about plaintiff bearing the expense, therefore it is to be implied that it was not to do so. Leaving out of consideration in this connection the fact that twice in section 3 of the contract the obligation to bear all the expense of what it undertook to do is put on plaintiff, we do not think the maxim invoked has application to the contention of plaintiff.

Among other cases cited in support of the proposition is that of Morrow v. Morgan, 48 Tex. 304. In that case it was provided in a mortgage that the mortgagor should keep possession of the property (real estate) until the maturity of the note. The mortgagee sought to give to the mortgage the construction that after the maturity of the note (it not being paid) he (the mortgagee) was to have possession. The Supreme Court said the contention was unsound; that under the law possession would continue in the mortgagor, and that the maxim, the express mention of one thing implies the exclusion of another, is ordinarily used to control, limit, or restrict the otherwise implied effect of an instrument, and not to "annex incidents to written contracts with respect to which they are silent."

If nothing had been said about expenses in either paragraph, the law would have made no implication that defendant was to pay them, and there being no reference to expenses in the first paragraph of section 5, while there is express provision in the third paragraph of section 5 that plaintiff shall pay expenses of getting the business, that fact did not have the effect to give to the first paragraph the meaning that defendant should pay the expenses (which would be the effect if plaintiff be given the credit claimed), since that would be to annex an incident to the contract concerning a matter as to which the parties were silent. Construing the contract as it is written, indulging in no inferences or implications, we are ·of the opinion that the plaintiff, Federal Union Surety Company, rested under the obligation to pay all the expenses of getting the business, whether new or old, and that it is entitled to no credit beyond the 35 per cent.

[3] We will next consider the contract as it relates to what, for convenience of expression, will be termed the "excise business." To properly interpret that portion of the contract is, if possible, more difficult than is that relating to the Indiana agency business.

The plaintiff in error contends the division of the returns on the "excise business" should be made on the basis of "gross premiums" for an entire year, as the term "gross premiums"

is defined in the contract, and its second proposition under its first and second assignments of error embodies that contention. The Supreme Court has indicated to us .that its opinion is that ·such contention is sound, and that the said proposition should be sustained.

The plaintiff in error, in the course of his argument under said assignment, phrases the following statement:

"If the Court of Civil Appeals is correct in reference to the Indiana state agency, but incorrect as to the New York business, then the judgment in this case should be in favor of defendant in the sum of $472.89."

In view of our conclusion as to the Indiana agency, and of the opinion of the Supreme Court as to the construction to be given that part of the contract relating to the "excise business," the conditional proposition stated by plaintiff in error as above quoted reflects the judgment which must be rendered.

The balance due defendant in error on the Indiana agency part of the contract is $10,-380.41. The net share of plaintiff in the "excise business" is $9,916.52. Plaintiff in error states the amount for which judgment should be rendered for defendant in error as $472.-89, and the Supreme Court advises us that if the calculation is correct the judgment should be so reformed and rendered. The calculation is to a slight extent erroneous, since the difference between $10,380.41 and $9,916.52 is $463.89.

It follows from what has been said that the judgment of the district court and the Court of Civil Appeals be reversed, and that judgment be here rendered for defendant in error for $463.89 with interest at 6 per cent. from June 15, 1913, and that the costs of the district court and Court of Civil Appeals be adjudged against plaintiff in error and the costs of the Supreme Court be adjudged against defendant. in error; and we so recommend.

PHILLIPS, C. J. The conclusion is approved that $10,380.41 is the correct balance due defendant in error, Southern Surety Co. on what the Commission calls "Indiana business."

The contract with reference to the New York pool excise business expressly providing that the profits, from which the Federal Surety Company was to receive fifty per cent., after the assignment of four per cent. to the Southern Surety Company, were to be arrived at by subtracting certain items from the "gross premiums derived from such business for the period mentioned," which was one year from June 15, 1912, and further expressly providing that complete and . final settlement was to be made between the parties on June 15, 1913, and that no losses, cancellations, etc., should be charged against the Federal Insurance Company that had not

arisen or occurred within a year from June 15, 1912, we think it plain that, as held by the District Court, the term "gross premiums derived from such business for the period mentioned" meant all· the premiums received between June 15, 1912, and June ·15, 1913, though the term for which the risk covered by the premiums ran had not expired on June 15, 1913. The contract makes all gross premiums from the excise business received during the twelve months the sum from which the items are to be subtracted. The contract enumerates the items, which are to be subtracted as "commissions paid to agents, losses, cancellations and returned premiums accrued during such year on account of the business for which' such gross premiums are collected." No other deduction can be made without changing the contract made by the parties. Calculating the Federal Surety Company's part of these profits, according to the contract as made by the parties, the same amounts to $9,916.52. Deducting this from the $10,380.41, balance due the Southern Surety Company, leaves $463.89, for which judgment should be rendered for defendant in error, and interest should be allowed and the costs should be taxed as recommended by the Commission, and judgment will be so entered; the judgments of the District Court and Court of Civils Appeals being accordingly reversed.