**BIRK et al. v. JACKSON.**

No. 1320.

Court of Civil Appeals of Texas. Eastland.

Oct. 19, 1934.

Rehearing Denied Nov. 9, 1934.

John C. Murphree, of Iowa Park, and John C. Kay and Bert King, both of Wichita Falls, for appellants.

Smoot & Smoot, of Wichita Falls, for appellee.

LESLIE, Justice.

Plaintiff S. B. Jackson instituted this suit against C. E. Birk and C. Birk doing business as the Greer Staple Cotton Breeding Farms, and the corporation attempted to be chartered as such in August, 1928. The defendants answered by general and special denial, and set up a cross-action for various sums. Both the plaintiff and the defendants interposed a plea of limitation to the respective claims of each other. The trial was before the court without a jury, and resulted in a judgment in favor of the plaintiff, after the court had rejected some of the claims urged by the plaintiff as well as some of those presented in the cross-action.

By six propositions the appellant C. Birk attacks the judgment as erroneous, and the appellee, by cross-assignments, contends that the court erred in allowing against him certain items claimed by defendants and alleged to be barred by limitation. The trial court made findings of fact and conclusions of law. The record also contains a statement of facts. The suit was primarily on a contract of employment. Some claims originated in services alleged to have been performed under a written contract evidenced by the following letter:

"July 24, 1928.
"Mr. S. B. Jackson, Executive Manager,
"Greer Staple Cotton Farms,
"Iowa Park, Texas.
"Dear Sir:

"This letter confirms our agreement regarding the salary, commissions, and share in the profits of our business, that you are to receive for your services during the season commencing Aug. 1, 1928, and ending Aug. 1, 1929.

"Your salary will be $300.00 per month; your commission ten cents per bushel on every bushel of seed sold by us; at the end of the season a ten percent share in the net profits made by us during the coming season.

"This is an increase in salary of $100.00 per month and the same agreement as to commissions and share in the profits of the business we had last year.

"It is understood that we are to pay your expenses when you are traveling on our business.

"Yours sincerely,
"Greer Staple Cotton Breeding Farms,
"By C. E. Birk, General Manager."

The record reflects that C. Birk, doing business as the Greer Staple Cotton Breeding Farms, was a grower of pedigreed cotton; that the Birks owned considerable farm lands; that C. Birk was in the gin business, owning two gins, at one of which cotton producing pure bred seed was ginned, and at the other ginning was done for the public. The plaintiff Jackson was the executive manager of the Greer Staple Cotton Farms, and primarily engaged in the sale of pedigreed seed for his employer. On this point he testified "the selling of seed for planting purposes was my work." He appears to have been engaged by the defendants to do substantially the same character of work as early as August 1, 1926, and continuously down to the date of said contract, commencing August 1, 1928, as that contemplated under the contract evidenced by the letter.

In substance the plaintiff's suit was for the following items, or sums: (1) Unpaid commissions "on every bushel of seed sold by us" (the defendants) during the season commencing August 1, 1928, and ending August 1, 1929, and "a ten percent share in the net profits made by us (the defendants) during the coming season," as specified in the letter; (2) $5,000 unpaid commissions for sale of cotton made under a special contract not covered by the letter; (3) $1,950 for services alleged to be one-half of an amount saved the defendants in a settlement of a disputed claim with Prison Commissioner after the expiration of the contract evidenced by the letter; (4) 50 cents per bushel as agreed commission on 22,133 bushels of cotton seed sold by the plaintiff at the request of the defendant after the expiration of the contract disclosed by the letter.

The defendants in their answer denied the plaintiff's claims and asserted by way of setoff numerous items, or sums, alleged to have been collected and unlawfully converted by the plaintiff in the course of his dealings with them during the employment. Except to state that the defendant undertook to sustain by evidence the numerous incriminating charges of conversion made against the plaintiff, a further statement of the testimony in that respect is unnecessary to a disposition of the appellants' first proposition, which, as against appellee's suit, invokes the "clean hands doc-

trine." In the language of the appellants, "this proposition is that the plaintiff should not be heard by the court because he came into the court with unclean hands," in that he had taken certain sums (set out in the cross-action) and converted them to his own use. Upon these grounds the appellants assert that the appellee should have had neither a "hearing" nor a "judgment."

We do not believe that the equitable principle "that he who comes into equity must come with clean hands" has any application to this case, as it is reflected by either the pleadings or the testimony. In the first place, this is simply a suit for a debt. Obviously, it is a suit at law as contradistinguished from a suit in equity where the named maxim finds special application. We recognize, of course, that the common-law forms of action have been abolished and that technically there is no such action as for debt in Texas. Nevertheless, the principles of the common law defining rights, and giving a right of action for the enforcement thereof, are still effective (1 Tex. Jur. § 5, p. 611), and it is said that the action may still, with propriety, be called "an action of debt" (13 Tex. Jur. § 4, p. 543).

In the second place, each claim asserted by the plaintiff is based upon an alleged contract, and such claim has neither origin nor any dependence whatever upon any wrong, or conversion, complained of by the defendants. The maxim has no application to misconduct of petitioner in no wise affecting the equitable relations between the parties and not arising out of the transaction as to which the relief is sought. In other words, the maxim applies only to the conduct of the complainant in respect to the particular transaction under consideration. Evidently the nature of this case furnishes no grounds for invoking this rule of equity. This conclusion is warranted by the following authorities: City of Dallas v. Cluck & Murphy (Tex. Civ. App.) 234 S. W. 582–587 (error ref.); Huggins v. Johnston (Tex. Civ. App.) 3 S. W.(2d) 937; Id., 120 Tex. 21, 35 S.W.(2d) 688; Oliver v. Huckins (Tex. Civ. App.) 244 S. W. 625–631; Ely v. King-Richardson Co., 265 Ill. 148, 106 N. E. 619, L. R. A. 1915B, 1052; Primeau v. Granfield (C. C. A.) 193 F. 911, 916, certiorari denied 225 U. S. 708, 32 S. Ct. 839, 56 L. Ed. 1267; 17 Tex. Jur. p. 50; 21 C. J. p. 187–188, and numerous authorities there cited.

In the Primeau Case, it is well said that "the real test in such a case * * * is whether the (complainant) requires any aid from the fraudulent transactions to establish his demand."

Further, it occurs to us that the alleged conversions and defaults charged by the defendants against the plaintiff amount to no more, if established, than mere credits, or offsets, against the plaintiff's claims. The trial seems to have established the validity of some of them and disproved others.

When this suit was filed (as disclosed by the pleadings and the testimony), the record of the numerous transactions between plaintiff and defendants was in the possession and control of the defendants. Being unable to obtain the consent of the defendants for an inspection of these records and files, that matter was presented to the trial court with a prayer for the appointment of an auditor. Upon a consideration of this application, the motion was granted and an auditor appointed to inspect the transactions and audit the accounts material to a determination of the fact issues in this case. This proceeding was merely incidental to the suit on the contract and is not, as we view it, to be interpreted as transferring the litigation into an equity suit for an accounting. In the interest of accuracy and economy in time and costs, the auditor was properly engaged by the court. Concerning the results of his effort and the attitude of those so strenuously invoking the doctrine of clean hands, the court in his findings of fact and conclusions of law, stated: "Practically all findings of the court auditor are excepted to by one party or the other and the court's findings in many respects differ from his. But this in no sense whatever is to be construed as a criticism of his work. He worked under the most unfavorable and often the most trying circumstances and was furnished no assistance by the defendants in whose custody were nearly all of the books and vouchers he examined and he had to appeal to the court for the right to examine them at all. This unfortunate condition arose early in the progress of his work and I am sure was largely responsible for the shortcomings of his report."

Upon the record, and under the authorities cited, we conclude that the misconduct alleged by the defendants did not sustain such relation or connection with the items or claims declared on as to bring them, or either of them, within the operation of the maxim. The first proposition is overruled.

By their second proposition the appellants make the point that the court erred in allowing the appellee a commission on about

47,369 bushels of cotton seed sold to oil mills because the contract between the plaintiff and defendants only contemplated the payment of a commission on sales to the public of "high class seed for planting purposes," and not on the sale of cotton seed by the defendants to an oil mill, or for commercial purposes. In other words, by a process of construction the appellants insist that the commission of "ten cents per bushel on every bushel of seed sold by us," as stipulated in the contract, should be held to mean a commission of ten cents per bushel on every bushel of "propagated cotton seed sold by us for planting purposes." To exclude a commission on the sale of seed to oil mills from the compensation apparently promised the plaintiff in the letter above set out, the appellants say that the standards of legal interpretation of contracts should be employed, and to arrive at a true and lawful meaning of the contract, resort should be had to the rules of construction stated in substance in 10 Tex. Jur. p. 293, § 169, as follows: "In construing a contract the court may put itself in the place of the parties who made it at the time when it was made, and may consider their situation and the subject matter of the contract, with which it will be conclusively presumed that the parties were familiar."

We are cited to numerous authorities announcing and applying the rule. Some of them are: Barber v. Herring (Tex. Com. App.) 229 S. W. 472, 474; Western Indemnity Co. v. Southern Surety Co. (Tex. Com. App.) 223 S. W. 179, 181; Dublin Electric & Gas Co. v. Thompson (Tex. Civ. App.) 166 S. W. 113; Ryan v. Kent (Tex. Com. App.) 36 S.W.(2d) 1007; Hoffer Oil Corp. v. Hughes (Tex. Civ. App.) 16 S.W.(2d) 901; Reed v. Merchants' Mutual Ins. Co. of Baltimore, 95 U. S. 23, 24 L. Ed. 348; Restatement of the Law of Contracts, §§ 230–236, particularly (a) and (b) of 236; 13 C. J. p. 542.

In the authority first cited the rule is stated thus: "It is elementary law that the situation of the parties, the object sought to be attained as a common purpose, and the surrounding circumstances can and should be looked to in the interpretation of the contract."

It is reasoned that if this be done, or the trial court had done so, no commission would have been allowed for seed sold to oil mills, as contradistinguished from the sale of high bred seed to planters for planting purposes. The above authorities no doubt state a correct rule of law, but this record does not call for its application, as the opinion will presently show.

There are, we think, sufficient reasons why this proposition should be overruled. And they present themselves in the outset, or at the threshold of the consideration of the point, and disclose there is no basis in the record for the contention.

In the first place, there is no testimony that the sales made to the oil mills were not such sales as were contemplated by the contract. There is evidence in this record that oil mills were interested in purchasing these high grade seed for planting purposes and encouraged their customers to use the same. They negotiated with said Jackson relative to such seed for that purpose. Further in this connection, the appellants frankly admit in their brief "we do not believe that the record discloses just what price per bushel the seed would have brought at the oil mill * * *." Therefore, it would seem that if the seed were sold to oil mills for planting or propagating purposes it would be a necessary inference that the customary price was paid for planting seed.

Again, as above noted, the proposition proceeds upon the theory that the court's judgment in favor of the plaintiff embraces the sum of about $4,739.60 for seed sold to oil mills and not for propagating purposes. Passing for the present over the question of the right of the appellee to a commission on the sale of seed to oil mills, we are of the opinion that the appellee's counter proposition, that the record fails to show that the trial court considered these oil mill sales in making up his judgment, should be sustained. There is support for such a view in the testimony warranting judgment for commissions during the season 1928–1929 amounting to $9,222. This would be 10 cents per bushel on 92,220 bushels of seed. There was evidence of sales and shipments of cotton seed from Iowa Park during the time material to the inquiry, which amounted to 138,000 bushels, exclusive of seed sold at Shreveport, La., amounting to 8,933 bushels. If, in fact, approximately 45,923 bushels of seed were sold during this period to oil mills, and it be conceded the appellee was entitled to no commission thereon, it is obvious that this amount of seed deducted from the above sum of 138,000 would leave approximately the amount of seed warranting the judgment on this item, and the discrepancy, if any, would be more than covered by the commissions derived from the Shreveport sales. The record

[redacted]

bearing upon this contention is not so clear as it should be, and the briefs of neither party completely clarify the point. The testimony is, however, susceptible to the interpretation given it, and which may have been adopted by the trial court. The judgment, we believe, is sustainable upon this theory.

■■ The foregoing sufficiently disposes of the proposition, but due to the insistence of the appellants that a consideration of the contract, evidenced by the letter, viewed from the situation and surroundings of the parties at the time they made it, would require a construction barring recovery by appellee on sales of cotton seed to oil mills, we have concluded to return to a brief consideration of that contention on its merits.

In 13 C. J. p. 542, § 514, where the nature and object of an agreement and the situation of the parties related thereto are discussed, and the pertinent rule of evidence stated, it is said: "In arriving at the intention of the parties where the language of a contract is susceptible of more than one construction it should be construed in the light of the circumstances surrounding them at the time it is made, it being the duty of the court to place itself as nearly as may be, in the situation of the parties at the time, so as to view the circumstances as they viewed them, and so to judge of the meaning of the words and the correct application of the language of the contract. * * * *This rule does not apply, however, where the language of the contract leaves no doubt as to the meaning of the parties, and in such a case the contract is to be construed without regard to extraneous facts.*" (Italics ours.)

With this rule in mind, we re-examined the contract embodied in the letter of July 24, 1928. A contract, or proposition, more simple, direct, and explicit could hardly be imagined. There is nothing equivocal about the language. It is in writing and no party to this litigation challenges its terms and provisions on the ground of accident, fraud, or mistake. In the respect under consideration it is susceptible to but one construction, a promise of "ten cents per bushel on every bushel of seed sold by us," the defendants. "Every bushel of seed" necessarily includes every sale made by the defendants, and the words "sold by us" necessarily comprehended the sales made by any of the defendants in person, or by agents.

The intention that is material and controlling in an inquiry of this kind is not the secret, unexpressed intention of one or all of the parties, but the intention expressed in the language used. Trinity County Lumber Co. v. Ocean, etc., Corp. (Tex. Com. App.) 228 S. W. 114, 116; Crichet v. Chapman et al. (Tex. Civ. App.) 63 S.W.(2d) 1099. The intention of the parties in the instant case (as evidenced by the contract) is so obvious that resort may not be had to the rules of construction for the purpose of reading into this plain, simple contract, limitations not even hinted at in the contract itself. The contract needs no aid from extraneous facts. We discover no reason why these parties should not have made the contract, as we interpret it, if they desired to so bind themselves. If such be the meaning of the language used, then the folly or the wisdom of the contract is not a consideration for the court. For this additional reason we think the proposition should be overruled.

■ By the third proposition it is urged that the court erred in allowing the plaintiff a 10 cents per bushel commission on 8,427 bushels of "reculled seed" which were not seed, in fact, sold. We have considered the testimony bearing on this point in the light of the references in the respective briefs, and finding the record referred to more or less confusing or uncertain, we have pursued the inquiry further. After so doing, we have formed the conclusion that an issue was decided by the court upon conflicting testimony given largely by the defendant Birk on the one hand, and the court auditor on the other. The auditor's version was not entirely accepted by the court, but the conclusion of the trial court is supported by testimony, and this court will not disturb the judgment in this respect. The proposition is overruled.

■ The fourth proposition asserts that the judgment is erroneous in that the court allowed the defendant a credit for only $2,471.45 for 80 bales of cotton delivered by defendants to Jackson, whereas, there should have been allowed a credit of $7,284.20, the alleged market value of the cotton at the time of the alleged conversion of the same by plaintiff. The two amounts result from difference in value of the cotton when actually sold and when it was converted, as alleged by the defendants. An alternative contention is made that if the 80 bales were not converted when and as alleged by the defendants, then at least 26 bales were converted, and that the market value at such time being greater than when the cotton was finally sold, the judgment should have been based on its value at the time of conversion and, therefore, proportionately greater offset allowed.

The testimony involved in the handling and marketing of this eighty bales of cotton was gone into at length in the trial. It is rather extended, but after a careful examination of the same we find that the trial court allowed the defendants the value thereof based upon the final sale of the cotton. This was an affirmative rejection of defendants' theory of conversion of the cotton by the plaintiff. A reasonable interpretation of the testimony supports this portion of the judgment, and the proposition is overruled.

The contention is made by the appellants in the fifth proposition that "the district court erred in allowing plaintiff below, S. B. Jackson, credit for any amount in making the settlement with the Texas Prison System, because the undisputed testimony shows that the adjustment was made because of damaged seed and Jackson testified that he was not entitled to any payment for credit allowed for damaged seed."

The testimony discloses that the Texas Prison Commission had a claim against the defendants for a large shipment of cotton seed concerning which a dispute arose. The appellee Jackson alleged and testified that the defendants made a special contract with him to the effect that they would pay him one-half of such amount as he saved them if he would effect a settlement with the commission. In the course of the trial he testified that he was not entitled to any compensation for any sums collected for the defendants by reason of *damaged seed*. On the trial the defendants contended that the alleged savings testified to by plaintiff were not, in fact, savings or a reduction in the prison claims, but was a sum allowed for damaged seed. On the other hand, the plaintiff testified positively that he effected a settlement of the claim amounting to about $11,681.25, and the interest claimed thereon, for $8,800. That under his special contract with the defendants he thereby became entitled to about $1,995. This indicates the issue involved in this item, and the court, after hearing the testimony, accepted appellee's testimony and rendered the judgment in his favor in the sum of $1,995, notwithstanding the claim had been disallowed by the auditor. It is doubtful to our minds that there was any competent testimony introduced to establish that the prison system made any concessions by reason of damaged seed, but, if there be any evidence to that effect, the most that could be said about it is that the testimony on the point was conflicting, and the trial judge has resolved that conflict in favor of the appellee. The proposition is overruled.

■ The appellants in their sixth proposition contend that "the undisputed proof shows that on the first year's employment, from August 1st, 1926 to July 1st, 1927, defendants paid plaintiff $2675.00 to be applied as salary. The contract agreed upon was $2400 for that year, and the proof shows conclusively that Jackson was over-paid on the item $275.00 * * *," wherefore, the defendants should be credited for that amount, which was not allowed by the trial court.

The statement and references contained in the appellants' brief relating to this proposition are confusing, and the error, if any, on the part of the trial court is not made manifest.

However, after an independent exploration of this record bearing upon the purported point, we conclude the proposition should be overruled for the following reasons: As we interpret the trial court's judgment he protected the defendants' rights as to this $275 excess salary, if any. The auditor charged the plaintiff with salary during this period in the amount of $4,625. After hearing the testimony on the trial, the court charged him with salary in the amount of $4,975. Granting the defendants in the season of 1926–27 paid $275 more salary than the contract provided for, concerning which we have doubts, the amount above charged to plaintiff by the court not only covered this $275, but an additional sum of $75 which we are unable to explain from the record, but which in any event is to the advantage of the defendants. The error, if any, was made harmless.

[■ Further, as a basis for the contention by which appellants reached the conclusion that there was an overpayment on the salary of $275 during said time, they assumed that $3,875 was paid Jackson from August 1, 1926, to August 1, 1927, "for salary and advance commissions covering this period." In the brief reference is made to a list of checks given Jackson during that period and found in the statement of facts. The court in his conclusions allowed Jackson $3,400 commissions during his entire employment. The auditor for the year ending July 31, 1928, and July 31, 1929, reported commissions paid $1,100 for each year, or $2,200 in all. This sum deducted by the appellants from the $3,400 leaves $1,200, which, as contended by the appellants, represents "commissions" for the year prior to July 31, 1927. Taking this $1,200, alleged commissions, from the $3,875 (assumed to be made up of commissions and salary as above noted), we have the sum of $2,675 claimed to have been paid out as salary

for the year beginning August 1, 1926, and ending August 1, 1927. Since the contract for salary was $2,400 for that year, the subtraction of this amount from $2,675, alleged to have been paid Jackson as salary on the above assumption, would leave the sum of $275 which appellants contend is the excess in salary payment which should be returned to them by reforming the judgment. When we examined the checks referred to as making up the $3,875, we find they aggregate a different amount, and somewhat larger than the sum just stated. This indicates the uncertainty, or indefiniteness, of the record to which we are pointed. More material, however, is the fact that it cannot be told from the checks, or the supplementary testimony, what many of them were given for, and hence they form no basis for the appellants' assumption or major premise that $3,875 was "for salary and advance commissions covering this period." For instance, one of the checks for $525 purports to have been given for salary $200, advance commissions $100, and safe $225. One of the $100 checks was given for "travelers' checks"; whereas, the contract provided that appellants were to bear "expenses when * * * traveling * * *." Some of these checks carried no notation as to what they were given for, and several of them carried the notation "deposit to credit of Jackson Stock Farm." One of the checks was made payable to I. C. Jackson; whereas the appellee's name is S. B. Jackson.

In view of the above state of the record, we are unable to say that the $3,875 merely embraced salary and advance commissions during said period. The evidence indicates the contrary. Hence the conclusion reached by the appellants is not warranted. The proposition is overruled.

■ The appellee's brief contains cross-assignments and propositions thereunder. In the first one he contends that the trial court erred in allowing the defendants credit for an item of $908.65, alleged to have been collected by the appellee October 15, 1929. In the second one, error is alleged to have been committed by the court in the allowance of an item for $545, claimed to have been converted by appellee April 3, 1930; and in the third, that the court erred in allowing an item of $656.-51, alleged to be an unpaid balance on certain notes charged to have been collected for the defendants' account on October 1, 1929, and appropriated by the appellee.

It is disclosed that these items were not claimed by appellants until they filed their cross-action April 18, 1933. Hence it is claimed that these items were barred by the statute of limitation, which defense was presented by special exceptions and pleas.

The trial court, upon the consideration of the plea of limitation urged by the respective litigants, found in his conclusions as follows: "I conclude that all pleas of the statute of limitations interposed by each party to portions of their respective accounts should be overruled, and that on account of the particular relationship of the parties limitation does not apply." In view of the fact that the plaintiff's original petition was filed in December, 1930, we are of the opinion that the trial court reached the correct conclusion. By an inspection of the dates on which the different claims for conversion, if any, accrued, it is obvious that at the time of the filing of this suit none of them were barred by limitation and the claims became offsets by operation of law.

In Shaw v. Faires (Tex. Civ. App.) 165 S. W. 501, 504, the court in discussing a contention like the one here under consideration said: "Without attempting to discuss the fundamental reasons underlying the rule, it may be said to be settled that if, at the time the plaintiff files his suit, the defendant is the owner of a subsisting counterclaim, as contemplated by the statute, which at said time is not barred by the two years' statute, the fact that the bar is completed before the counterclaim is urged in a proper pleading will not deprive defendant of the right to set off such counterclaim against plaintiff at any time during the progress of the suit. Such result is not true because of any suspension of limitation, but on the principle that such mutual accounts extinguish one the other pro tanto whenever plaintiff declares upon his demand."

The right of offset in the instant case is in no way challenged, except on the theory of limitation, and it cannot be said from the record there is any error in this part of the court's judgment.

In the disposition of this appeal we have labored under some difficulty due to the condition of the record. We have nevertheless carefully considered the points in the light of the briefs and such independent search of the record as we have been able to make. After so doing, we have come to the conclusion that the litigants have had a fair and accurate trial and that the judgment should be affirmed. It is so ordered.